# LOVING *v.* UNITED STATES

No. 94–1966.   Argued January 9, 1996—Decided June 3, 1996

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined, and in which O'CONNOR and SCALIA, JJ., joined as to Parts I, II, III, IV–B, and IV–C. STEVENS, J., filed a concurring opinion, in which SOUTER, GINS-BURG, and BREYER, JJ., joined, *post*, p. 774. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which O'CONNOR, J., joined, *post*, p. 775. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 777.

*John H. Blume* argued the cause for petitioner. With him on the briefs were *Teresa L. Norris, Roy H. Hewitt, Fran W. Walterhouse,* and *Walter S. Weedman.*

*Deputy Solicitor General Kneedler* argued the cause for the United States. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Miguel A. Estrada,* and *John F. De Pue.**

---

*\*Ronald W. Meister, Steven R. Shapiro,* and *Diann Y. Rust-Tierney* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

*Kent S. Scheidegger* and *Charles L. Hobson* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for Public Citizen, Inc., by *Alan B. Morrison, David C. Vladeck,* and *Eugene R. Fidell;* for the United States

JUSTICE KENNEDY delivered the opinion of the Court.

The case before us concerns the authority of the President, in our system of separated powers, to prescribe aggravating factors that permit a court-martial to impose the death penalty upon a member of the Armed Forces convicted of murder.

I

On December 12, 1988, petitioner Dwight Loving, an Army private stationed at Fort Hood, Texas, murdered two taxicab drivers from the nearby town of Killeen. He attempted to murder a third, but the driver disarmed him and escaped. Civilian and Army authorities arrested Loving the next afternoon. He confessed.

After a trial, an eight-member general court-martial found Loving guilty of, among other offenses, premeditated murder and felony murder under Article 118 of the Uniform Code of Military Justice (UCMJ), 10 U. S. C. §§ 918(1), (4). In the sentencing phase of the trial, the court-martial found three aggravating factors: (1) that the premeditated murder of the second driver was committed during the course of a robbery, Rule for Courts-Martial (RCM) 1004(c)(7)(B); (2) that Loving acted as the triggerman in the felony murder of the first driver, RCM 1004(c)(8); and (3) that Loving, having been found guilty of the premeditated murder, had committed a second murder, also proved at the single trial, RCM 1004(c)(7)(J). The court-martial sentenced Loving to death. The commander who convened the court-martial approved the findings and sentence. Cf. 10 U. S. C. § 860. The United States Army Court of Military Review and the United States Court of Appeals for the Armed Forces (formerly the United States Court of Military Appeals (CMA)) affirmed, 41 M. J. 213 (1994), relying on *United States* v. *Curtis*, 32 M. J.

Navy-Marine Corps Appellate Defense Division by *John Francis Havranek, Howard Barry Goodman,* and *Phillip Del Grissom;* and for Marci A. Hamilton et. al. by *David Schoenbrod, pro se.*

252 (CMA), cert. denied, 502 U. S. 952 (1991), to reject Loving's claims that the President lacked authority to promulgate the aggravating factors that enabled the court-martial to sentence him to death. We granted certiorari. 515 U. S. 1191 (1995).

## II

Although American courts-martial from their inception have had the power to decree capital punishment, they have not long had the authority to try and to sentence members of the Armed Forces for capital murder committed in the United States in peacetime. In the early days of the Republic the powers of courts-martial were fixed in the Articles of War. Congress enacted the first Articles in 1789 by adopting in full the Articles promulgated in 1775 (and revised in 1776) by the Continental Congress. Act of Sept. 29, 1789, ch. 25, § 4, 1 Stat. 96. (Congress reenacted the Articles in 1790 "as far as the same may be applicable to the constitution of the United States," Act of Apr. 30, 1790, ch. 10, § 13, 1 Stat. 121.) The Articles adopted by the First Congress placed significant restrictions on court-martial jurisdiction over capital offenses. Although the death penalty was authorized for 14 military offenses, American Articles of War of 1776, reprinted in W. Winthrop, Military Law and Precedents 961 (reprint 2d ed. 1920) (hereinafter Winthrop); Comment, Rocks and Shoals in a Sea of Otherwise Deep Commitment: General Court-Martial Size and Voting Requirements, 35 Nav. L. Rev. 153, 156–158 (1986), the Articles followed the British example of ensuring the supremacy of civil court jurisdiction over ordinary capital crimes that were punishable by the law of the land and were not special military offenses. 1776 Articles, § 10, Art. 1, reprinted in Winthrop 964 (requiring commanders, upon application, to exert utmost effort to turn offender over to civil authorities). Cf. British Articles of War of 1765, § 11, Art. 1, reprinted in Winthrop 937 (same). That provision was deemed protection enough for soldiers, and in 1806 Congress debated and re-

jected a proposal to remove the death penalty from court-martial jurisdiction. Wiener, Courts-Martial and the Bill of Rights: The Original Practice I, 72 Harv. L. Rev. 1, 20–21 (1958).

Over the next two centuries, Congress expanded court-martial jurisdiction. In 1863, concerned that civil courts could not function in all places during hostilities, Congress granted courts-martial jurisdiction of common-law capital crimes and the authority to impose the death penalty in wartime. Act of Mar. 3, 1863, § 30, 12 Stat. 736, Rev. Stat. § 1342, Art. 58 (1875); *Coleman* v. *Tennessee*, 97 U. S. 509, 514 (1879). In 1916, Congress granted to the military courts a general jurisdiction over common-law felonies committed by service members, except for murder and rape committed within the continental United States during peacetime. Articles of War of 1916, ch. 418, § 3, Arts. 92–93, 39 Stat. 664. Persons accused of the latter two crimes were to be turned over to the civilian authorities. Art. 74, 39 Stat. 662. In 1950, with the passage of the UCMJ, Congress lifted even this restriction. Article 118 of the UCMJ describes four types of murder subject to court-martial jurisdiction, two of which are punishable by death:

> "Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—
>
> "(1) has a premeditated design to kill;
>
> "(2) intends to kill or inflict great bodily harm;
>
> "(3) is engaged in an act which is inherently dangerous to another and evinces a wanton disregard of human life; or
>
> "(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;
>
> "is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or im-

prisonment for life as a court-martial may direct." 10 U. S. C. § 918.

So matters stood until 1983, when the CMA confronted a challenge to the constitutionality of the military capital punishment scheme in light of *Furman* v. *Georgia*, 408 U. S. 238 (1972), and our ensuing death penalty jurisprudence. Although it held valid most of the death penalty procedures followed in courts-martial, the court found one fundamental defect: the failure of either the UCMJ or the RCM to require that court-martial members "specifically identify the aggravating factors upon which they have relied in choosing to impose the death penalty." *United States* v. *Matthews*, 16 M. J. 354, 379. The court reversed Matthews' death sentence, but ruled that either Congress or the President could remedy the defect and that the new procedures could be applied retroactively. *Id.*, at 380–382.

The President responded to *Matthews* in 1984 with an Executive Order promulgating RCM 1004. In conformity with 10 U. S. C. § 852(a)(1), the Rule, as amended, requires a unanimous finding that the accused was guilty of a capital offense before a death sentence may be imposed, RCM 1004(a)(2). The Rule also requires unanimous findings (1) that at least one aggravating factor is present and (2) that any extenuating or mitigating circumstances are substantially outweighed by any admissible aggravating circumstances, 1004(b). RCM 1004(c) enumerates 11 categories of aggravating factors sufficient for imposition of the death penalty. The Rule also provides that the accused is to have "broad latitude to present evidence in extenuation and mitigation," 1004(b)(3), and is entitled to have the members of the court-martial instructed to consider all such evidence before deciding upon a death sentence, 1004(b)(6).

This is the scheme Loving attacks as unconstitutional. He contends that the Eighth Amendment and the doctrine of separation of powers require that Congress, and not the

President, make the fundamental policy determination respecting the factors that warrant the death penalty.

## III

A preliminary question in this case is whether the Constitution requires the aggravating factors that Loving challenges. The Government does not contest the application of our death penalty jurisprudence to courts-martial, at least in the context of a conviction under Article 118 for murder committed in peacetime within the United States, and we shall assume that *Furman* and the case law resulting from it are applicable to the crime and sentence in question. Cf. *Trop* v. *Dulles,* 356 U. S. 86 (1958) (analyzing court-martial punishments under the Eighth Amendment). The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield* v. *Phelps,* 484 U. S. 231, 244 (1988) (quoting *Zant* v. *Stephens,* 462 U. S. 862, 877 (1983)). Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. 484 U. S., at 244. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process." *Id.,* at 246.

Although the Government suggests the contrary, Brief for United States 11, n. 6, we agree with Loving, on the assumption that *Furman* applies to this case, that aggravating factors are necessary to the constitutional validity of the military capital punishment scheme as now enacted. Article 118 authorizes the death penalty for but two of the four types of murder specified: premeditated and felony murder are punishable by death, 10 U. S. C. §§ 918(1), (4), whereas

intentional murder without premeditation and murder resulting from wanton and dangerous conduct are not, §§ 918(2), (3). The statute's selection of the two types of murder for the death penalty, however, does not narrow the death-eligible class in a way consistent with our cases. Article 118(4) by its terms permits death to be imposed for felony murder even if the accused had no intent to kill and even if he did not do the killing himself. The Eighth Amendment does not permit the death penalty to be imposed in those circumstances. *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982). As a result, additional aggravating factors establishing a higher culpability are necessary to save Article 118. We turn to the question whether it violated the principle of separation of powers for the President to prescribe the aggravating factors required by the Eighth Amendment.

## IV

Even before the birth of this country, separation of powers was known to be a defense against tyranny. Montesquieu, The Spirit of the Laws 151–152 (T. Nugent transl. 1949); 1 W. Blackstone, Commentaries *146–*147, *269–*270. Though faithful to the precept that freedom is imperiled if the whole of legislative, executive, and judicial power is in the same hands, The Federalist No. 47, pp. 325–326 (J. Madison) (J. Cooke ed. 1961), the Framers understood that a "hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," *Buckley* v. *Valeo*, 424 U. S. 1, 120–121 (1976) *(per curiam)*.

> "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).

Although separation of powers "'d[oes] not mean that these [three] departments ought to have no partial agency in, or no controul over the acts of each other,'" *Mistretta* v. *United States*, 488 U. S. 361, 380–381 (1989) (quoting The Federalist No. 47, *supra*, at 325–326 (emphasis deleted)), it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another. See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 225–226 (1995) (Congress may not revise judicial determinations by retroactive legislation reopening judgments); *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986) (Congress may not remove executive officers except by impeachment); *INS* v. *Chadha*, 462 U. S. 919, 954–955 (1983) (Congress may not enact laws without bicameral passage and presentment of the bill to the President); *United States* v. *Klein*, 13 Wall. 128, 147 (1872) (Congress may not deprive court of jurisdiction based on the outcome of a case or undo a Presidential pardon). Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties. *Mistretta* v. *United States, supra*, at 397–408 (examining whether statute requiring participation of Article III judges in the United States Sentencing Commission threatened the integrity of the Judicial Branch); *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 445 (1977) (examining whether law requiring agency control of Presidential papers disrupted the functioning of the Executive).

Deterrence of arbitrary or tyrannical rule is not the sole reason for dispersing the federal power among three branches, however. By allocating specific powers and responsibilities to a branch fitted to the task, the Framers created a National Government that is both effective and accountable. Article I's precise rules of representation, member qualifications, bicameralism, and voting procedure make Congress the branch most capable of responsive and

deliberative lawmaking. See *Chadha, supra,* at 951. Ill suited to that task are the Presidency, designed for the prompt and faithful execution of the laws and its own legitimate powers, and the Judiciary, a branch with tenure and authority independent of direct electoral control. The clear assignment of power to a branch, furthermore, allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance.

Another strand of our separation-of-powers jurisprudence, the delegation doctrine, has developed to prevent Congress from forsaking its duties. Loving invokes this doctrine to question the authority of the President to promulgate RCM 1004. The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U. S. Const., Art. I, § 1, and may not be conveyed to another branch or entity. *Field* v. *Clark,* 143 U. S. 649, 692 (1892). This principle does not mean, however, that only Congress can make a rule of prospective force. To burden Congress with all federal rulemaking would divert that branch from more pressing issues, and defeat the Framers' design of a workable National Government. Thomas Jefferson observed: "Nothing is so embarrassing nor so mischievous in a great assembly as the details of execution." 5 Works of Thomas Jefferson 319 (P. Ford ed. 1904) (letter to E. Carrington, Aug. 4, 1787). See also *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 529–530 (1935) (recognizing "the necessity of adapting legislation to complex conditions involving a host of details with which the national legislature cannot deal directly"). This Court established long ago that Congress must be permitted to delegate to others at least some authority that it could exercise itself. *Wayman* v. *Southard,* 10 Wheat. 1, 42 (1825).

> " 'The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring author-

ity or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.'" *Field, supra,* at 693–694, quoting *Cincinnati, W. & Z. R. Co.* v. *Commissioners of Clinton County,* 1 Ohio St. 77, 88–89 (1852).

Loving contends that the military death penalty scheme of Article 118 and RCM 1004 does not observe the limits of the delegation doctrine. He presses his constitutional challenge on three fronts. First, he argues that Congress cannot delegate to the President the authority to prescribe aggravating factors in capital murder cases. Second, he contends that, even if it can, Congress did not delegate the authority by implicit or explicit action. Third, Loving believes that even if certain statutory provisions can be construed as delegations, they lack an intelligible principle to guide the President's discretion. Were Loving's premises to be accepted, the President would lack authority to prescribe aggravating factors in RCM 1004, and the death sentence imposed upon him would be unconstitutional.

## A

Loving's first argument is that Congress lacks power to allow the President to prescribe aggravating factors in military capital cases because any delegation would be inconsistent with the Framers' decision to vest in Congress the power "To make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, § 8, cl. 14. At least in the context of capital punishment for peacetime crimes, which implicates the Eighth Amendment, this power must be deemed exclusive, Loving contends. In his view, not only is the determination of aggravating factors a quintessential policy judgment for the Legislature, but the history of military capital punishment in England and America refutes a contrary interpretation. He asserts that his offense was not tried in a military court throughout most of English

and American history. It is this historical exclusion of common-law capital crimes from military jurisdiction, he urges, that must inform our understanding of whether Clause 14 reserves to Congress the power to prescribe what conduct warrants a death sentence, even if it permits Congress to authorize courts-martial to try such crimes. See Brief for Petitioner 42–43; Brief for United States Navy-Marine Corps Appellate Defense Division as *Amicus Curiae* 7–12, 19–26. Mindful of the historical dangers of autocratic military justice and of the limits Parliament set on the peacetime jurisdiction of courts-martial over capital crimes in the first Mutiny Act, 1 Wm. & Mary, ch. 5 (1689), and having experienced the military excesses of the Crown in colonial America, the Framers harbored a deep distrust of executive military power and military tribunals. See *Reid* v. *Covert*, 354 U. S. 1, 23–24 (1957) (plurality); *Lee* v. *Madigan*, 358 U. S. 228, 232 (1959). It follows, Loving says, that the Framers intended that Congress alone should possess the power to decide what aggravating factors justify sentencing a member of the Armed Forces to death.

We have undertaken before, in resolving other issues, the difficult task of interpreting Clause 14 by drawing upon English constitutional history. See, *e. g., Reid, supra,* at 23–30; *O'Callahan* v. *Parker,* 395 U. S. 258, 268–272 (1969) (determining that courts-martial only had jurisdiction of service-connected crimes); *Solorio* v. *United States,* 483 U. S. 435, 442–446 (1987) (overruling *O'Callahan* and taking issue with its historical analysis). Doing so here, we find that, although there is a grain of truth in Loving's historical arguments, the struggle of Parliament to control military tribunals and the lessons the Framers drew from it are more complex than he suggests. The history does not require us to read Clause 14 as granting to Congress an exclusive, nondelegable power to determine military punishments. If anything, it appears that England found security in divided authority, with Parliament at times ceding to the Crown the

task of fixing military punishments. From the English experience the Framers understood the necessity of balancing efficient military discipline, popular control of a standing army, and the rights of soldiers; they perceived the risks inherent in assigning the task to one part of the Government to the exclusion of another; and they knew the resulting parliamentary practice of delegation. The Framers' choice in Clause 14 was to give Congress the same flexibility to exercise or share power as times might demand.

In England after the Norman Conquest, military justice was a matter of royal prerogative. The rudiments of law in English military justice can first be seen in the written orders issued by the King for various expeditions. Winthrop 17–18. For example, in 1190 Richard I issued an ordinance outlining six offenses to which the crusaders would be subject, including two punishable by death: "Whoever shall slay a man on ship-board, he shall be bound to the dead man and thrown into the sea. If he shall slay him on land he shall be bound to the dead man and buried in the earth." Ordinance of Richard I—A. D. 1190, reprinted in *id.*, at 903. The first comprehensive articles of war were those declared by Richard II at Durham in 1385 and Henry V at Mantes in 1419, which decreed capital offenses that not only served military discipline but also protected foreign noncombatants from the ravages of war. T. Meron, Henry's Wars and Shakespeare's Laws: Perspectives on the Law of War in the Later Middle Ages 91–93 (1993). Articles of War, sometimes issued by military commanders acting under royal commission in the ensuing centuries, Winthrop 19, were not fixed codes, at least through the 17th century; rather, "each war, each expedition, had its own edict," which lost force after the cessation of hostilities and the disbanding of the army that had been formed. J. Pipon & J. Collier, Manual of Military Law 14 (3d rev. ed. 1863).

Thus, royal ordinances governed the conduct of war, but the common law did not countenance the enforcement of mili-

tary law in times of peace "when the king's courts [were] open for all persons to receive justice according to the laws of the land." 1 W. Blackstone, Commentaries *413. See also M. Hale, History of the Common Law of England 25–27 (C. Gray ed. 1971) (describing efforts of Parliament and the common-law courts to limit the jurisdiction of the military Courts of the Constable and the Marshal).

> "The Common Law made no distinction between the crimes of soldiers and those of civilians in time of peace. All subjects were tried alike by the same civil courts, so 'if a life-guardsman deserted, he could only be sued for breach of contract, and if he struck his officer he was only liable to an indictment or action of battery.'" *Reid, supra,* at 24, n. 44 (quoting 2 J. Campbell, Lives of the Chief Justices of England 91 (1849)).

See also 1 T. Macaulay, History of England 272 (n. d.) (hereinafter Macaulay).

The triumph of civil jurisdiction was not absolute, however. The political disorders of the 17th century ushered in periods of harsh military justice, with soldiers and at times civilian rebels punished, even put to death, under the summary decrees of courts-martial. See C. Clode, Administration of Justice Under Military and Martial Law 20–42 (1872) (hereinafter Clode). Cf. Petition of Right of 1627, 3 Car. I, ch. 1 (protesting court-martial abuses). Military justice was brought under the rule of parliamentary law in 1689, when William and Mary accepted the Bill of Rights requiring Parliament's consent to the raising and keeping of armies. In the Mutiny Act of 1689, Parliament declared the general principle that "noe Man may be forejudged of Life or Limbe or subjected to any kinde of punishment by Martiall Law or in any other manner then by the Judgement of his Peeres and according to the knowne and Established Laws of this Realme," but decreed that "Soldiers who shall Mutiny or

stirr up Sedition or shall desert Their Majestyes Service be brought to a more Exemplary and speedy Punishment than the usuall Forms of Law will allow," and "shall suffer Death or such other Punishment as by a Court-Martiall shall be Inflicted." 1 Wm. & Mary, ch. 5.

In one sense, as Loving wants to suggest, the Mutiny Act was a sparing exercise of parliamentary authority, since only the most serious domestic offenses of soldiers were made capital, and the militia was exempted. See *Solorio, supra*, at 442. He misunderstands the Mutiny Act of 1689, however, in arguing that it bespeaks a special solicitude for the rights of soldiers and a desire of Parliament to exclude Executive power over military capital punishment.

The Mutiny Act, as its name suggests, came on the heels of the mutiny of Scottish troops loyal to James II. 3 Macaulay 45–49. The mutiny occurred at a watershed time. Menaced by great continental powers, England had come to a grudging recognition that a standing army, long decried as an instrument of despotism, had to be maintained on its soil. The mutiny cast in high relief the dangers to the polity of a standing army turned bad. Macaulay describes the sentiment of the time:

> "There must then be regular soldiers; and, if there were to be regular soldiers, it must be indispensable, both to their efficiency, and to the security of every other class, that they should be kept under a strict discipline. An ill disciplined army . . . [is] formidable only to the country which it is paid to defend. A strong line of demarcation must therefore be drawn between the soldiers and the rest of the community. For the sake of public freedom, they must, in the midst of freedom, be placed under a despotic rule. They must be subject to a sharper penal code, and to a more stringent code of procedure, than are administered by the ordinary tribunals." *Id.*, at 50.

The Mutiny Act, then, was no measure of leniency for soldiers. With its passage, "the Army of William III. was governed under a severer Code than that made by his predecessors under the Prerogative authority of the Crown. The Mutiny Act, without displacing the Articles of War and those Military Tribunals under which the Army had hitherto been governed, gave statutory sanction to the infliction of Capital Punishments for offences rather Political than Military, and which had rarely been so punished under Prerogative authority." Clode 9–10. See also Duke & Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vand. L. Rev. 435, 443, and n. 40 (1960) (noting that the Articles of War of 1662 and 1686 prohibited the infliction in peacetime of punishment costing life or limb). Indeed, it was the Crown that later tempered the excesses of courts-martial wielding the power of capital punishment. It did so by stipulating in the Articles of War (which remained a matter of royal prerogative) that all capital sentences be sent to it for revision or approval. Clode 9–10.

Popular suspicion of the standing army persisted, 5 Macaulay 253–273, 393, and Parliament authorized the Mutiny Acts only for periods of six months and then a year, 3 *id.*, at 51–53. But renewed they were time and again, and Parliament would alter the power of courts-martial to impose the death penalty for peacetime offenses throughout the next century. It withdrew the power altogether in 1713, 12 Anne, ch. 13, § 1, only to regret the absence of the penalty during the rebellion of 1715, Clode 49. The third of the Mutiny Acts of 1715 subjected the soldier to capital punishment for a wide array of peacetime offenses related to political disorder and troop discipline. *Id.*, at 50. And, for a short time in the 18th century, Parliament allowed the Crown to invest courts-martial with a general criminal jurisdiction over soldiers even at home, placing no substantive limit on the penalties that could be imposed; until 1718, that jurisdiction was

superior to civil courts. *Id.*, at 52–53. The propriety of that general jurisdiction within the kingdom was questioned, and the jurisdiction was withdrawn in 1749. *Id.*, at 53. Nevertheless, even as it continued to adjust the scope of military jurisdiction at home, Parliament entrusted broad powers to the Crown to define and punish military crimes abroad. In 1713, it gave statutory sanction to the Crown's longstanding practice of issuing Articles of War without limiting the kind of punishments that might be imposed; and, in the same Act, it delegated the power to "erect and constitute Courts Martial with Power to try hear and determine any Crime or Offence by such Articles of War and inflict Penalties by Sentence or Judgement of the same in any of Her Majesties Dominions beyond the Seas or elsewhere beyond the Seas (except in the Kingdom of Ireland) . . . as might have been done by Her Majesties Authority beyond the Seas in Time of War." 12 Anne, ch. 13, § 43; Winthrop 20. Cf. Duke & Vogel, *supra*, at 444 (noting that Parliament in 1803 gave statutory authority to the Crown to promulgate Articles of War applicable to troops stationed in England as well). See *Solorio*, 483 U. S., at 442 (discussing a provision in the British Articles of War of 1774 providing court-martial jurisdiction of civilian offenses by soldiers).

As Loving contends, and as we have explained elsewhere, the Framers well knew this history, and had encountered firsthand the abuses of military law in the colonies. See *Reid*, 354 U. S., at 27–28. As many were themselves veterans of the Revolutionary War, however, they also knew the imperatives of military discipline. What they distrusted were not courts-martial *per se*, but military justice dispensed by a commander unchecked by the civil power in proceedings so summary as to be lawless. The latter was the evil that caused Blackstone to declare that "martial law"—by which he, not observing the modern distinction between military and martial law, meant decrees of courts-martial disciplining soldiers in wartime—"is built upon no settled principles, but

is entirely arbitrary in its decisions, [and] is, as Sir Matthew Hale observes, in truth and reality no law, but something indulged rather than allowed as a law." 1 Blackstone's Commentaries *413. See also Hale, History of the Common Law of England, at 26–27; Clode 21 (military law in early 17th-century England amounted to "the arbitrary right to punish or destroy, without legal trial, any assumed delinquent"). The partial security Englishmen won against such abuse in 1689 was to give Parliament, preeminent guardian of the British constitution, primacy in matters of military law. This fact does not suggest, however, that a legislature's power must be exclusive. It was for Parliament, as it did in the various Mutiny Acts, to designate as the times required what peacetime offenses by soldiers deserved the punishment of death; and it was for Parliament, as it did in 1713, to delegate the authority to define wartime offenses and devise their punishments, including death. The Crown received the delegated power and the concomitant responsibility for its prudent exercise. The lesson from the English constitutional experience was that Parliament must have the primary power to regulate the Armed Forces and to determine the punishments that could be imposed upon soldiers by courts-martial. That was not inconsistent, however, with the further power to divide authority between it and the Crown as conditions might warrant.

Far from attempting to replicate the English system, of course, the Framers separated the powers of the Federal Government into three branches to avoid dangers they thought latent or inevitable in the parliamentary structure. The historical necessities and events of the English constitutional experience, though, were familiar to them and inform our understanding of the purpose and meaning of constitutional provisions. As we have observed before, with this experience to consult they elected not to "freeze court-martial usage at a particular time" for all ages following, *Solorio, supra,* at 446, nor did they deprive Congress of the

services of the Executive in establishing rules for the governance of the military, including rules for capital punishment. In the words of Alexander Hamilton, the power to regulate the Armed Forces, like other powers related to the common defense, was given to Congress

> "without limitation: Because it is impossible to foresee or define the extent and variety of national exigencies, or the corresponding extent & variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be co-extensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils, which are appointed to preside over the common defence." The Federalist No. 23, at 147 (emphasis deleted).

The later-added Bill of Rights limited this power to some degree, cf. *Burns* v. *Wilson*, 346 U. S. 137, 140 (1953) (plurality opinion); *Chappell* v. *Wallace*, 462 U. S. 296, 300 (1983), but did not alter the allocation to Congress of the "primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military," *Solorio*, 483 U. S., at 447–448.

Under Clause 14, Congress, like Parliament, exercises a power of precedence over, not exclusion of, Executive authority. Cf. *United States* v. *Eliason*, 16 Pet. 291, 301 (1842) ("The power of the executive to establish rules and regulations for the government of the army, is undoubted"). This power is no less plenary than other Article I powers, *Solorio*, *supra*, at 441, and we discern no reasons why Congress should have less capacity to make measured and appropriate delegations of this power than of any other, see *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 220–221 (1989)

(Congress may delegate authority under the taxing power); cf. *Lichter* v. *United States*, 334 U. S. 742, 778 (1948) (general rule is that "[a] constitutional power implies a power of delegation of authority under it sufficient to effect its purposes") (emphasis deleted). Indeed, it would be contrary to precedent and tradition for us to impose a special limitation on this particular Article I power, for we give Congress the highest deference in ordering military affairs. *Rostker* v. *Goldberg*, 453 U. S. 57, 64–65 (1981). And it would be contrary to the respect owed the President as Commander in Chief to hold that he may not be given wide discretion and authority. We decline to import into Clause 14 a restrictive nondelegation principle that the Framers left out.

There is no absolute rule, furthermore, against Congress' delegation of authority to define criminal punishments. We have upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations "confin[e] themselves within the field covered by the statute." *United States* v. *Grimaud*, 220 U. S. 506, 518 (1911). See also *Touby* v. *United States*, 500 U. S. 160 (1991). The exercise of a delegated authority to define crimes may be sufficient in certain circumstances to supply the notice to defendants the Constitution requires. See *M. Kraus & Bros., Inc.* v. *United States*, 327 U. S. 614, 622 (1946). In the circumstances presented here, so too may Congress delegate authority to the President to define the aggravating factors that permit imposition of a statutory penalty, with the regulations providing the narrowing of the death-eligible class that the Eighth Amendment requires.

In 1950, Congress confronted the problem of what criminal jurisdiction would be appropriate for Armed Forces of colossal size, stationed on bases that in many instances were small societies unto themselves. Congress, confident in the procedural protections of the UCMJ, gave to courts-martial juris-

diction of the crime of murder. Cf. *Solorio, supra,* at 450–451 (Congress may extend court-martial jurisdiction to any criminal offense committed by a service member during his period of service). It further declared the law that service members who commit premeditated and felony murder may be sentenced to death by a court-martial. There is nothing in the constitutional scheme or our traditions to prohibit Congress from delegating the prudent and proper implementation of the capital murder statute to the President acting as Commander in Chief.

### B

Having held that Congress has the power of delegation, we further hold that it exercised the power in Articles 18 and 56 of the UCMJ. Article 56 specifies that "[t]he punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense." 10 U. S. C. § 856. Article 18 states that a court-martial "may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by [the UCMJ], including the penalty of death when specifically authorized by" the Code. § 818. As the Court of Military Appeals pointed out in *Curtis,* for some decades the President has used his authority under these Articles to increase the penalties for certain noncapital offenses if aggravating circumstances are present. For example, by regulation, deserters who are apprehended are punished more severely than those who surrender; drunken drivers suffer a harsher fate if they cause an accident resulting in the death of a victim; and the punishment of thieves is graded by the value of the stolen goods. See *Curtis,* 32 M. J., at 261. The President has thus provided more precision in sentencing than is provided by the statute, while remaining within statutory bounds. This past practice suggests that Articles 18 and 56 support as well an authority in the President to restrict the death sentence to murders in which certain aggravating circumstances have been established.

There is yet a third provision of the UCMJ indicative of congressional intent to delegate this authority to the President. Article 36 of the UCMJ, which gives the President the power to make procedural rules for courts-martial, provides:

> "Pretrial, trial, and post-trial procedures, including modes of proof, for [courts martial] . . . may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter." 10 U. S. C. § 836(a).

Although the language of Article 36 seems further afield from capital aggravating factors than that of Article 18 or 56, it is the provision that a later Congress identified as the source of Presidential authority to prescribe these factors. In 1985, Congress enacted Article 106a of the UCMJ, 10 U. S. C. § 906a, which authorized the death penalty for espionage. The Article requires a finding of an aggravating factor if the accused is to be sentenced to death; it enumerates three such factors, but allows death to be decreed on "[a]ny other factor that may be prescribed by the President by regulations under section 836 of this title (article 36)." § 906a(c)(4). Article 106a itself, then, is premised on the President's having authority under Article 36 to prescribe capital aggravating factors, and " '[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.' " *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118, n. 13 (1980) (quoting *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969)). Whether or not Article 36 would stand on its own as the source of the delegated power, we hold that Articles 18, 36, and 56 together give clear authority to the President for the promulgation of RCM 1004.

Loving points out that the three Articles were enacted as part of the UCMJ in 1950, well before the need for eliminating absolute discretion in capital sentencing was established in *Furman* v. *Georgia*, 408 U. S. 238 (1972), and the cases that followed. (Slight amendments to the Articles have been made since but are not relevant here.) In 1950, he argues, Congress could not have understood that it was giving the President the authority to bring an otherwise invalid capital murder statute in line with Eighth Amendment strictures. Perhaps so, but *Furman* did not somehow undo the prior delegation. What would have been an act of leniency by the President prior to *Furman* may have become a constitutional necessity thereafter, see *supra*, at 755–756, but the fact remains the power to prescribe aggravating circumstances has resided with the President since 1950.

## C

It does not suffice to say that Congress announced its will to delegate certain authority. Congress as a general rule must also "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928); *Touby*, 500 U. S., at 165. The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes. *Field*, 143 U. S., at 693–694. Though in 1935 we struck down two delegations for lack of an intelligible principle, *A. L. A. Schecter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935), and *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935), we have since upheld, without exception, delegations under standards phrased in sweeping terms. See, *e. g., National Broadcasting Co.* v. *United States*, 319 U. S. 190, 216–217, 225–226 (1943) (upholding delegation to the Federal Communications Commission to regulate radio broadcasting according to

"public interest, convenience, or necessity"). Had the delegations here called for the exercise of judgment or discretion that lies beyond the traditional authority of the President, Loving's last argument that Congress failed to provide guiding principles to the President might have more weight. We find no fault, however, with the delegation in this case.

In *United States* v. *Curtis*, the Court of Military Appeals discerned a principle limiting the President's discretion to define aggravating factors for capital crimes in Article 36: namely, the directive that regulations the President prescribes must "apply the principles of law . . . generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter," 10 U. S. C. §836(a). We think, however, that the question to be asked is not whether there was any explicit principle telling the President how to select aggravating factors, but whether any such guidance was needed, given the nature of the delegation and the officer who is to exercise the delegated authority. First, the delegation is set within boundaries the President may not exceed. Second, the delegation here was to the President in his role as Commander in Chief. Perhaps more explicit guidance as to how to select aggravating factors would be necessary if delegation were made to a newly created entity without independent authority in the area. Cf. *Mistretta*, 488 U. S., at 374–379 (upholding delegation to the United States Sentencing Commission because of detailed congressional directives channeling agency discretion). The President's duties as Commander in Chief, however, require him to take responsible and continuing action to superintend the military, including the courts-martial. The delegated duty, then, is interlinked with duties already assigned to the President by express terms of the Constitution, and the same limitations on delegation do not apply "where the entity exercising the delegated authority itself possesses independent authority over the subject matter," *United States* v. *Mazurie*, 419 U. S.

544, 556–557 (1975). See also *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319–322 (1936). Cf. *Swaim* v. *United States*, 165 U. S. 553, 557–558 (1897) (President has inherent authority to convene courts-martial). Like the Court of Military Appeals, *Curtis*, 32 M. J., at 263, n. 9, we need not decide whether the President would have inherent power as Commander in Chief to prescribe aggravating factors in capital cases. Once delegated that power by Congress, the President, acting in his constitutional office of Commander in Chief, had undoubted competency to prescribe those factors without further guidance. "The military constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff* v. *Willoughby*, 345 U. S. 83, 94 (1953), and the President can be entrusted to determine what limitations and conditions on punishments are best suited to preserve that special discipline.

It is hard to deem lawless a delegation giving the President broad discretion to prescribe rules on this subject. From the early days of the Republic, the President has had congressional authorization to intervene in cases where courts-martial decreed death. American Articles of War of 1806, Art. 65, reprinted in Winthrop 976, 982. It would be contradictory to say that Congress cannot further empower him to limit by prospective regulation the circumstances in which courts-martial can impose a death sentence. Specific authority to make rules for the limitation of capital punishment contributes more toward principled and uniform military sentencing regimes than does case-by-case intervention, and it provides greater opportunity for congressional oversight and revision.

Separation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes. The delegation to the President as Commander in Chief of the authority to pre-

scribe aggravating factors was in all respects consistent with these precepts, and the promulgation of RCM 1004 was well within the delegated authority. Loving's sentence was lawful, and the judgment of the Court of Appeals for the Armed Forces is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring.

As JUSTICE SCALIA correctly points out, petitioner has not challenged the power of the tribunal to try him for a capital offense. *Post*, at 775. It is important to add to this observation that petitioner's first victim was a member of the Armed Forces on active duty and that the second was a retired serviceman who gave petitioner a ride from the barracks on the same night as the first killing. Brief for United States 5. On these facts, this does not appear to be a case in which petitioner could appropriately have raised the question whether the holding in *Solorio* v. *United States*, 483 U. S. 435 (1987), should be extended to reach the imposition of the death penalty for an offense that did not have the "service connection" required prior to the change in the law effected in that case. *Id.*, at 451 (STEVENS, J., concurring in judgment).

The question whether a "service connection" requirement should obtain in capital cases is an open one both because *Solorio* was not a capital case, and because *Solorio*'s review of the historical materials would seem to undermine any contention that a military tribunal's power to try capital offenses must be as broad as its power to try noncapital ones. See *id.*, at 442–446. Moreover, the question is a substantial one because, when the punishment may be death, there are particular reasons to ensure that the men and women of the Armed Forces do not by reason of serving their country receive less protection than the Constitution provides for civilians.

As a consequence of my conclusion that the "service connection" requirement has been satisfied here, I join not only the Court's analysis of the delegation issue, but also its disposition of the case. By joining in the Court's opinion, however, I do not thereby accept the proposition that our decision in *Solorio* must be understood to apply to capital offenses. Nor do I understand the Court's decision to do so. That question, as I have explained, remains to be decided.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins, concurring in part and concurring in the judgment.

I join the Court's opinion, except that with respect to Part IV thereof I join only subparts B and C.

The discussion of English history that features so prominently in the Court's discussion of Congress's power to grant the authority at issue to the President is in my view irrelevant. To be sure, there is ample precedent in our cases for looking to the history of English courts-martial—but not where the question is of the sort before us today. We have surveyed that history for the purpose of establishing the permissible scope of the jurisdiction of military tribunals over certain classes of defendants and offenses, see, *e. g., Solorio* v. *United States,* 483 U. S. 435, 442–446 (1987); *Lee* v. *Madigan,* 358 U. S. 228, 232 (1959); *Reid* v. *Covert,* 354 U. S. 1, 23–27 (1957) (plurality); see also *Parker* v. *Levy,* 417 U. S. 733, 745 (1974). This case does not present such a question. Petitioner does not assert that tradition establishes his offense to be, in its nature, beyond the jurisdiction of military courts, or that courts-martial are historically incapable of adjudicating capital offenses. His arguments are altogether different: that Congress cannot authorize the President to establish "aggravating factors" designed to carry out the narrowing function that (we assume) is necessary for imposition of a capital sentence; and that, even if Congress *can* give the President authority to perform this function, such

authorization has not been effected by the statutes upon which the Government relies.

I do not see how consideration of those arguments profits from analysis of the historical sharing of power between Parliament and the English throne. William and Mary's acceptance of the Bill of Rights, and Parliament's enactment of the Mutiny Act of 1689, see *ante*, at 762–765, are presumably significant occurrences for students of the unwritten English constitution. Our written Constitution does not require us to trace out that history; it provides, in straightforward fashion, that "The Congress shall have Power . . . To make Rules for the Government and Regulation of the land and naval Forces," U. S. Const., Art. I, § 8, cl. 14, and as the Court notes, see *ante*, at 767–768, it does not set forth any special limitation on Congress's assigning to the President the task of implementing the laws enacted pursuant to that power. And it would be extraordinary simply to infer such a special limitation upon tasks given to the President as Commander in Chief, where his inherent powers are clearly extensive.

In drafting the Constitution, the Framers were not seeking to replicate in America the government of England; indeed, they set their plan of government out in writing in part to make clear the ways in which it was different from the one it replaced. The Court acknowledges this, see *ante*, at 766, but nonetheless goes on to treat the form of English government as relevant to determining the limitations upon Clause 14's grant of power to Congress. I would leave this historical discussion aside. While it is true, as the Court demonstrates, that the scheme of assigned responsibility here conforms to English practices, that is so *not* because Clause 14 requires such conformity, but simply because what seemed like a good arrangement to Parliament has seemed like a good arrangement to Congress as well.

I have one point of definition or conceptualization, which applies to those portions of the opinion that I have joined. While it has become the practice in our opinions to refer to

"unconstitutional delegations of legislative authority" versus "lawful delegations of legislative authority," in fact the latter category does not exist. Legislative power is nondelegable. Congress can no more "delegate" some of its Article I power to the Executive than it could "delegate" some to one of its committees. What Congress does is to *assign responsibilities* to the Executive; and when the Executive undertakes those assigned responsibilities it acts, not as the "delegate" of Congress, but as the agent of the People. At some point the responsibilities assigned can become so extensive and so unconstrained that Congress has in effect delegated its legislative power; but until that point of excess is reached there exists, not a "lawful" delegation, but no delegation at all.

JUSTICE THOMAS, concurring in the judgment.

It is not clear to me that the extensive rules we have developed under the Eighth Amendment for the prosecution of civilian capital cases, including the requirement of proof of aggravating factors, necessarily apply to capital prosecutions in the military, cf. *Chappell* v. *Wallace,* 462 U. S. 296, 300–302 (1983), and this Court has never so held, see *Schick* v. *Reed,* 419 U. S. 256, 260 (1974).* I am therefore not certain that this case even raises a delegation question, for if Loving can constitutionally be sentenced to death without proof of aggravating factors, he surely cannot claim that the President violated the Constitution by promulgating aggravating factors that afforded more protection than that to which Loving is constitutionally entitled.

Like the majority, I conclude that the Government prevails even if we assume, without deciding, that aggravating factors are required in this context. There is abundant author-

---

*Although the applicability of *Furman* v. *Georgia,* 408 U. S. 238 (1972), and its progeny to the military is an open question, the United States surprisingly makes no argument that the military is exempt from the byzantine rules that we have imposed upon the States in their administration of the death penalty.

ity for according Congress and the President sufficient deference in the regulation of military affairs to uphold the delegation here, and I see no need to resort to our nonmilitary separation-of-powers and "delegation doctrine" cases in reaching this conclusion. I write separately to explain that by concurring in the judgment in this case, I take no position with respect to Congress' power to delegate authority or otherwise alter the traditional separation of powers outside the military context.

In light of Congress' express constitutional authority to regulate the Armed Forces, see U. S. Const., Art. I, § 8, cl. 14, and the unique nature of the military's mission, we have afforded an unparalleled degree of deference to congressional action governing the military. See *Rostker* v. *Goldberg,* 453 U. S. 57, 64–65 (1981). "[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise," *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 17 (1955), and this Court has recognized the limits on its own competence in advancing this core national interest, see *Gilligan* v. *Morgan,* 413 U. S. 1, 10 (1973). Mindful of the factors that "differentiate military society from civilian society," we have concluded that the Constitution permits Congress "to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter." *Parker* v. *Levy,* 417 U. S. 733, 756 (1974). This heightened deference extends not only to congressional action but also to executive action by the President, who by virtue of his constitutional role as Commander in Chief, see U. S. Const., Art. II, § 2, cl. 1, possesses shared authority over military discipline. See *Schlesinger* v. *Ballard,* 419 U. S. 498, 510 (1975) ("The responsibility for determining how best our Armed Forces shall attend to th[e] business [of fighting or preparing to fight wars] rests with Congress and with the President") (citations omitted). See also *Brown* v. *Glines,* 444 U. S. 348, 360 (1980)

("Both Congress and this Court have found that the special character of the military requires civilian authorities to accord military commanders some flexibility in dealing with matters that affect internal discipline and morale. In construing a statute that touches on such matters, therefore, courts must be careful not to 'circumscribe the authority of military commanders to an extent never intended by Congress'") (citations omitted). Under these and many similar cases reviewing legislative and executive control of the military, the sentencing scheme at issue in this case, and the manner in which it was created, are constitutionally unassailable.

On a separate point, I agree with JUSTICE SCALIA that the majority's extended analysis of the division of authority between the English Parliament and the Crown with regard to regulation of the military, see *ante*, at 759–766, has no relevance to this case. It is true that we frequently consult English history and common law in attempting to determine the content of constitutional provisions, but the majority fails to cite a single separation-of-powers case in which we have relied on the structure of the English Government in attempting to understand the governmental structure erected by the Framers of the Constitution. Nor does the majority cite any historical evidence, whether from the constitutional debates, the Federalist Papers, or some other source, that demonstrates that the Framers sought to embrace, or at least actively considered, the English system of shared power over the military. If the majority pointed to some basis for conducting the inquiry that it does, I might be willing to accept its analysis. Instead, the majority repeatedly substitutes *ipse dixit* for historical evidence. See, *e. g.*, *ante*, at 761 ("From the English experience the Framers . . . knew the . . . parliamentary practice of delegation" and "[t]he Framers' choice in Clause 14 was to give Congress the same flexibility to exercise or share power"); *ante*, at 765 ("the Framers well knew this history"); *ante*, at 766 ("The histori-

cal necessities and events of the English constitutional experience . . . were familiar to [the Framers] and inform our understanding of the purpose and meaning of constitutional provisions"). I have no doubt that the Framers were well versed in English history. But it is too simplistic for purposes of constitutional analysis to draw conclusions about the allocation of constitutional authority among the branches of the United States Government from mere speculation about the Framers' familiarity with English military history and the significance that they attached to it.