Anthony J. BROOKS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 03–2470C.

United States Court of Federal Claims.

April 18, 2005.

**136**

Eugene R. Fidell, Feldesman Tucker Leifer Fidell LLP, Washington, D.C., for the plaintiff. Matthew S. Freedus, Feldesman Tucker Leifer Fidell LLP, Washington, D.C., of counsel.

Lisa B. Donis, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Bryant G. Snee, Assistant Director, all of Washington, D.C., for the defendant. Lisa M. Flynn, Office of the General Counsel, Department of Health and Human Services, Washington, D.C., of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

Plaintiff Anthony J. Brooks seeks back pay and appointment to the office of Chief Pharmacist Officer of the United States Public Health Service. Defendant United States moves to dismiss Capt. Brooks's complaint under Rule 12(b)(6) of the Rules of the Unit-

ed States Court of Federal Claims ("RCFC"), arguing that the official whose approval was required never appointed Capt. Brooks, and that the selection decision was discretionary and non-justiciable. Plaintiff cross-moves for summary judgment under RCFC 56(a). For the reasons that follow, the government's motion is DENIED and Capt. Brooks's motion is GRANTED–IN–PART.

## I. BACKGROUND

This case concerns promotion practices within the United States Public Health Service ("PHS" or "the Service"), a sub-agency of the Department of Health and Human Services ("HHS"). The PHS traces its origins to 1798, the year Congress passed a bill providing for the care of injured and ailing merchant seamen. See "The History of the Commissioned Corps," www.usphs.gov/html/history.html (last visited Apr. 4, 2005). Some eighty years later the existing network of relief hospitals was organized into the Marine Hospital Service, to which Congress added the uniformed Commissioned Corps in 1889. Id. The Service assumed responsibility for implementing the federal quarantine laws following the passage of the 1878 National Quarantine Act. Additional responsibilities led to a Service name change in 1902 and again in 1912 to its present form and title.[1] Originally a stand-alone agency, the Service was reorganized as a sub-agency of HHS (then Health, Education and Welfare ("HEW")) in 1966. See Reorganization Plan No. 3 of 1966, 80 Stat. 1610.

The HHS Assistant Secretary for Health is the Service's chief administrator. 42 U.S.C. § 202 (2000). The Service includes the Office of the Surgeon General and the Commissioned Corps of uniformed officers whom the President appoints with the advice and consent of the Senate. Id. §§ 203–204. By law, Commissioned Corps officers are entitled to pay. 37 U.S.C. § 204(a)(1) (with reference to 37 U.S.C. § 101(3)); 42 U.S.C. § 210(a)(1). Also, they are entitled to a number of bene-

---

1. For more information on the history of the Service, see RALPH C. WILLIAMS, THE UNITED STATES PUBLIC HEALTH SERVICE, 1798–1950 (1951).

fits available to members of the Armed Services.[2] *See* 42 U.S.C. § 213a.

Capt. Brooks joined the Commissioned Corps in 1979. Pl.'s App. to Cross–Mot. for Summ. J. ("Pl.'s App.") at 47. He began his career at St. Elizabeth's Hospital in Washington, D.C. Next, he went to the National Institutes of Health ("NIH"), Clinical Center, Pharmacy Department, in Bethesda, Maryland. After a brief stint in NIH's Rockville, Maryland office, Capt. Brooks transferred to the Addiction Research Center at the National Institute on Drug Abuse in Baltimore, Maryland to serve as its Chief Pharmacist.[3] During his time in the Service Capt. Brooks has been highly decorated: nineteen medals, citations and commendations as of March, 2000. *Id.* at 82. For the years 1995 through 1999, Capt. Brooks's Officer Evaluation Reports were quite positive: ratings of "exceptional" and mean value scores of ninety-nine or one hundred for each year. *Id.* at 81.

In the Spring of 2000 the Chief Pharmacist Officer ("CPO") Promotion Board nominated Capt. Brooks and four other candidates for the position of CPO. *Id.* at 176. The CPO is one of eight Chief Professional Officer positions expressly authorized by statute. 42 U.S.C. § 206(b). *Cf.* Pl.'s App. at 194 (Commissioned Corps Personnel Manual ("CCPM") CC23.4 Instruction 6 ("Instruction 6") § B). The CPO "provides leadership for and is senior advisor to the Surgeon General on pharmacy professional affairs for the Office of the Surgeon General (OSG) and the Department of Health and Human Services (HHS)." Pl.'s App. at 173. On July 7, 2000, the plaintiff interviewed with Deputy Surgeon General Kenneth Moritsugu. *Id.* at 176. On September 17, 2000, Surgeon General David Satcher interviewed the plaintiff. *Id.*

The next day the Surgeon General issued a memorandum to the Director of the Division of Commissioned Personnel ("DCP"), with a copy to Capt. Brooks, selecting the plaintiff as the CPO. *Id.* at 102. The memorandum had as its stated subject the "Designation of Chief Pharmacist Officer" and read:

> I have selected CAPT Anthony J. Brooks (PHS# 49500) to be the Chief Pharmacist Officer of the U.S. Public Health Service for a term of four years beginning October 1, 2000.[¶]Accordingly, please issue the appropriate personnel order with an October 1, 2000, effective date reflecting this designation, in addition to current duties specified in the billet, for a period not to exceed October 1, 2004. This position is a statutory flag billet. [¶]Thank you for your assistance.

Pl.'s App. at 102. On September 22, the Acting Chief of Staff of the Surgeon General's office, Richard G. Wyatt, contacted Capt. Brooks to inform him that the "memorandum had been sent in error," citing "a problem in processing the action." *Id.* at 103.

On September 28, 2000, the DCP Director, Michael Davidson, issued to Capt. Brooks a Letter of Reprimand ("LOR"). *Id.* at 104. The LOR was issued because Capt. Brooks had sent documents to the Board for Correction for PHS Commissioned Corps Records ("BCCCR" or "the Board") that contained protected information regarding another PHS officer. The BCCCR is a civilian Correction Board authorized by statute. *See* 10 U.S.C. § 1552; 42 U.S.C. § 213a(a)(12). It and its counterpart Boards in the Armed Services are given the authority to amend officers' military records "to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); *see Richey v. United States,* 322 F.3d 1317, 1323 (Fed.Cir.2003).

The plaintiff had sent certain documents to the BCCCR as part of a 1999 administrative complaint requesting that his promotion to

---

2. This is not entirely inapt when one considers that PHS officers wear uniforms, 37 U.S.C. § 101(3), and have the power to arrest for quarantines. *See In Defense of the 'Old' Public Health: Professor Epstein Delivers the Ira M. Belfer Lecture,* BLS LawNotes, Fall 2004, at 6.

3. The Addiction Research Center is within the National Institute on Drug Abuse, which itself is an institute within NIH. NIH is under the Secretary of HHS. *See* http://www.hhs.gov/about/orgchart.html (last visited Apr. 5, 2005). Although Capt. Brooks serves within NIH, for employment matters he is under the authority of the Office of the Surgeon General and the Division of Commissioned Personnel. Both of these sub-agencies are within the PHS, which is headed by the Assistant Secretary for Health of HHS.

grade O–6 be made effective as of October, 1996, instead of July, 1997.[4] Pl.'s App. at 3–4. Some of these documents contained disparaging information regarding a fellow officer who had been given a favorable agency rating. Capt. Brooks intended to use the example of this fellow officer to show the inequity of the Service's promotion procedures, given that Capt. Brooks's record was allegedly much superior to that of the other officer's yet Capt. Brooks did not receive the same favorable agency rating. Although he had blackened out all references to the officer's name, Capt. Brooks failed to blacken out the officer's Social Security number and PHS number on one document. See id. at 10. The BCCCR sent the documents to the Division of Commissioned Personnel as part of its investigation into Capt. Brooks's complaint. In a July 31, 2000 letter to the Board, Capt. Denise Canton, counsel for DCP, first mentioned the Division's intention to investigate whether Capt. Brooks had violated the Privacy Act, 5 U.S.C. § 552a (2000), by submitting documents containing protected information as part of his complaint.[5] Pl.'s App. at 86. On August 18, 2000, the DCP notified the plaintiff through the BCCCR that "they reserved the right to take action because they thought [Capt. Brooks] might have violated another officer's privacy act [rights]." Id. at 107. A little more than a month later the LOR was issued.

Captain Brooks contested the LOR to Mr. Davidson. He argued that he was assured by the Executive Secretary of the BCCCR

that any documents he should submit as part of this application for correction would be confidential and themselves covered by the Privacy Act. Id. at 112. Captain Brooks also noted that the instructions for lodging an application for correction expressly provided that any information submitted to the Board would be covered by the Privacy Act. Id. Mr. Davidson affirmed his decision to issue the LOR.[6] Id. at 114–16. The plaintiff then appealed Mr. Davidson's decision to Mr. Steven Seward, Special Initiatives Manager and Acting Deputy Director of Program Support, Human Resources Service. Mr. Seward granted the plaintiff's appeal and rescinded the LOR, stating:

> I have reviewed your submission and find that at the time [the DCP Director] issued the letter of reprimand and subsequently denied your grievance, he had evidence that in fact supported his decision. However, new information has surfaced which raises questions as to the basis for the original decision. There is now substantial evidence supporting that the action you took with regard to another officer's record in your appeal to the [BCCCR] was not a violation of the Privacy Act.

Id. at 138. This "new information" was not identified.

Captain Brooks next contested the Surgeon General's apparent rescission of the plaintiff's selection as CPO by adding that grievance to his existing complaint before the

**4.** In 1995, the many sub-agencies of NIH agreed to add a sixth criterion for determining who among promotion-eligible Commissioned Corps officers should be advanced. See Pl.'s App. at 66–67. This new "sixth precept," entitled "Agency Recommendation," consisted of two sub-factors: "Impact on Mission" and "Value Added," the latter further subdivided into quality of services/product and initiative/creativity. Id. at 37, 74. All promotion-eligible officers were to be assigned to one of four cohorts, but regardless of how NIH sub-agencies rated the officers, at the NIH-level, assignment of the officers to particular cohorts had to be consistent with a curve, according to which no more than twenty-five percent of the promotion-eligible officers could be given the highest recommendation. Id. at 38, 74. It was this practice to which Capt. Brooks objected. He argued that it was unfair to rate officers relative to their agency, because officers from agencies that had comparatively fewer offi-

cers would have a better chance of being placed in the highest cohort than those officers from agencies with more officers. See id. at 53. He further noted that his sub-agency rating by NIDA was for the first cohort, but he was placed in the third cohort at the agency level. Id. at 54. The Division of Commissioned Personnel argued before the Board, essentially, that Capt. Brooks could not show causation—i.e., he could not prove that but for the sixth precept he would have been promoted. See id. at 18, 60, 89.

**5.** In her revised Advisory Opinion to the Board, Capt. Canton noted that the DCP had confirmed through Debra Harris, Office of the General Counsel of HHS, that the plaintiff might have violated the Privacy Act. Id. at 90.

**6.** Mr. Davidson conceded that the "timing of the LOR was unfortunate." Pl.'s App. at 114.

BCCCR, *see id.* at 167, but the Surgeon General had already decided to reopen the CPO competition. On November 6, 2000, he had issued a circular changing the CPO nomination criteria to allow persons with more than twenty-six years of creditable retirement service to compete. *Id.* at 172. Captain Brooks again competed for this position. On February 15, 2001, the CPO selection board met to rate the candidates; by this time the LOR had been removed from the plaintiff's file, but the Surgeon General's September 18 memorandum selecting Capt. Brooks as the CPO had not been removed. The board ranked Capt. Brooks twelfth of seventeen candidates; only the top five could proceed on to Surgeon General consideration. Therefore, Capt. Brooks did not make the cut. *See id.* at 170. Richard S. Walling was eventually selected as the CPO, more than twenty-six years after he joined the Service in 1974. It thus appears that Mr. Walling would have been excluded from the first CPO competition because he had served more years than was allowed under the initial selection criteria. *See id.* at 173.

On June 19, 2002, the BCCCR issued its Recommendations regarding Capt. Brooks's request for retroactive O–6 promotion and for confirmation of his selection as an O–7 CPO. As to the retroactive promotion issue, the BCCCR recommended that the request be denied and no correction to the plaintiff's record be made. *Id.* at 185. As for the plaintiff's CPO selection, the BCCCR commented:

> The LOR resulted in an error and an injustice. This was proven to be so since the LOR was rescinded through the grievance process. It stopped the selection process and issuance of the Personnel Order which may have identified CAPT Brooks as the Chief Pharmacist and his promotion to the flag grade O–7.

*Id.* at 188. The Board recommended that the plaintiff be given special consideration for all O–7 flag grade positions that would become available for the next three years.

The Deputy Assistant Secretary for Program Support and "Approving Authority," Mike Blank, reviewed the BCCCR's recommendations and disapproved the suggested relief. He conceded that "an injustice may have occurred" when the Surgeon General's Office did not seek the HHS Secretary's approval of the plaintiff's selection, because the Surgeon General's decision "may have been related" to "the issuance of the letter of reprimand." *Id.* at 191. But even if that were the case, Mr. Blank concluded that Capt. Brooks would not be entitled to the relief that the BCCCR recommended, for two reasons: (1) "The [CPO] position was a Flag Grade and required the Secretary's approval making the selection process for the Chief Pharmacist position different from the selection process utilized for other positions"; and (2) "there was no guarantee that even if the Surgeon General had sought the Secretary's approval, the Secretary would have concurred with the selection and the appointment of CAPT Brooks." *Id.* In a March 2003 letter, the BCCCR notified Capt. Brooks of Mr. Blank's disapproval of the BCCCR's recommendations. *Id.* at 192. Seven months later the plaintiff filed his complaint with this Court.

## II. STANDARDS OF REVIEW

The defendant has moved to dismiss the complaint under RCFC 12(b)(6) for "failure to state a claim upon which relief can granted." The Court must dismiss the complaint if, after accepting all well-pleaded factual allegations as true, and drawing all reasonable inferences therefrom, the plaintiff is not entitled to any remedy. *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998).

The plaintiff has cross-moved for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An outcome-determinative fact is a material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party may show the "absence of evidence to support the nonmov-

ing party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

The Court reviews the decision of a Secretary acting through a Correction Board according to a standard borrowed from the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 701–06 (2000). The Court reviews the HHS Secretary's decision that rejected the BCCCR's recommendation and thereby denied relief to Capt. Brooks, to determine if the Secretary's action was "illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 811 (1979). *See Bond v. United States*, 47 Fed.Cl. 641, 662 (2000).

## III. ANALYSIS

### A. The defendant's motion to dismiss

The government offers two related reasons why this matter should be dismissed as failing to state a claim. The first is that Capt. Brooks was never appointed to the CPO position because, under the government's interpretation of the applicable laws and regulations, Secretary approval was required and was never obtained. The second is that, since the appointment never occurred, what is being challenged is the selection of a CPO, a discretionary personnel matter that cannot be reviewed in court. These arguments are considered, in turn.

### 1. Is the CPO a special temporary position?

■ Defendant argues that Capt. Brooks was never appointed to the CPO position, for that position can be filled only with the approval of the Secretary of HHS. This argument was rejected by the BCCCR, but accepted by the Deputy Assistant Secretary in his disapproval of the Board's recommendation. *See* Pl.'s App. at 187–88; *id.* at 191. It

ultimately turns on whether the Chief Pharmacist Officer position is a "special temporary position," over which the Secretary has retained the approval and, hence, appointment power. The key to resolving this issue is understanding the difference between positions on the one hand, and the grade or rank that accompanies these, on the other.

The CPO position was created by act of Congress:

> The [Secretary of HHS][7] *shall assign* eight commissioned officers from the Regular Corps to be, respectively, the Director of the National Institutes of Health, the Chief of the Bureau of State Services, the Chief of the Bureau of Medical Services, the Chief Medical Officer of the United States Coast Guard, the Chief Dental Officer of the Service, the Chief Naval Officer of the Service, the Chief Nurse Officer of the Service, *the Chief Pharmacist Officer* of the Service, and the Chief Sanitary Engineering Officer of the Service, and *while so serving they shall each have the title of Assistant Surgeon General.*

42 U.S.C. § 206(b) (emphases added). Thus, by law, there must be a CPO, and the person serving as CPO bears the title Assistant Surgeon General. Congress has further provided that, "Assistant Surgeons General, while assigned as such, shall have the grade corresponding with either the grade of brigadier general or the grade of major general, as may be determined by the Secretary after considering the importance of the duties to be performed." 42 U.S.C. § 207(a). The naval rank that corresponds with the grades of brigadier general and of major general is rear admiral (lower and upper half, respectively), and the Service ranks are 0–7 and 0–8. *See* "Grades, Titles, and Billets in the Commissioned Corps," www.usphs.gov/html/grades.html (last visited Apr. 12, 2005). The parties agree that a position carrying the 0–7 grade or rank is at issue in this case.

7. The statute as codified still identifies the "Surgeon General" as the person who is to do the assigning of these positions. After the creation of HEW, however, this responsibility was transferred to the Secretary of HEW, *see* Reorganiza-tion Plan No. 3 of 1966, 80 Stat. 1610, and now rests with the Secretary of HHS. *See* "Transfer of Functions," Historical and Statutory Notes to 42 U.S.C. § 206.

Had there been no delegation of authority from the HHS Secretary, the matter would easily be resolved, as the statute gives the power to assign a CPO to the Secretary. But effective January 20, 1988, the following delegation of authority was made by the Secretary:

I also delegate to the Assistant Secretary for Health, with authority to redelegate except as noted below, those authorities vested in the Secretary which are necessary to administer the PHS Commissioned Corps Personnel System.... Special conditions apply to the exercise of the following authorities: [¶] 1. The authority to create special temporary positions in the grade of Assistant Surgeon General may not be redelegated. Further, I retain the authority to approve the selection of persons to all such positions.

53 FED. REG. 3457–58 (1988).

The next month, the Assistant Secretary for Health redelegated his authority (except the power to create special temporary positions) to the Surgeon General:

I have also delegated to the Surgeon General, with authority to redelegate except as noted below, those authorities delegated to the Assistant Secretary for Health which are necessary to administer the PHS Commissioned Corps Personnel System.... Special conditions apply to the exercise of the following authorities: [¶] I have retained the authority to create special temporary positions in the grade of Assistant Surgeon General. [¶] The Secretary has retained the authority to issue regulations pertaining to the PHS Commissioned Corps and the authority to approve selection of persons in special temporary positions in the grade of Assistant Surgeon General.

53 FED. REG. 5046–47 (1988), Pl.'s App. at 238–39.[8]

The defendant contends that the CPO position is a "special temporary position in the grade of Assistant Surgeon General," be-

cause the rank is held only while serving in that position, and thus the Secretary "retain[ed] the authority to approve the selection of persons to all such positions." *See* 53 FED. REG. 3458. But this argument misconstrues the relevant statute. The reference in the delegation regulation to the "authority to create special temporary positions in the grade of Assistant Surgeon General" cannot mean the CPO position, for this was already created by Congress, in 42 U.S.C. § 206(b). Rather, this is a reference to positions created under the authority of 42 U.S.C. § 206(c), which comes under the heading "Creation of temporary positions as Assistant Surgeons General":

[T]he Secretar[y] is authorized to create special temporary positions in the grade of Assistant Surgeons General when necessary for the proper staffing of the Service. The [Secretary][9] may assign officers of either the Regular Corps or the Reserve Corps to any such temporary position, and while so serving they shall each have the title of Assistant Surgeon General.

42 U.S.C. § 206(c)(1). Although the statute is crystal clear on this point, it is confirmed by the next code section concerning grades of commissioned officers, which provides:

That the number of Assistant Surgeons General having a grade higher than that corresponding to the grade of brigadier general shall at no time exceed one-half the number of positions *created by subsection (b)* of section 206 of this title *or pursuant to subsection (c)* of section 206 of this title.

42 U.S.C. § 207(a) (emphases added). The Chief Pharmacist Officer position is created *by the statute*, in contrast to the "special temporary positions" created by the Secretary pursuant to section 206(c).

The government argues that the CPO position is nevertheless a "special temporary position" because the holder of the position is entitled to a flag grade while holding the position, which he or she may lose upon

---

8. This delegation is not critical to the Court's analysis, because Dr. Satcher was serving as both the Assistant Secretary for Health and the Surgeon General at the pertinent times. *See* Pl.'s App. at 102.

9. *See* note 7, above.

leaving the position. But this confuses the position with the *grade or rank* that accompanies it. The grade may be temporarily held with the position, but the position will always have the grade associated with it. The Surgeon General understood this simple distinction, as he called the position a "statutory flag billet" in his memorandum selecting Capt. Brooks. *See* Pl.'s App. at 102. Further, there is nothing either "special" or "temporary" about the CPO position, as the Congress has required that the Secretary (or his designate) *shall assign* someone to this position. 42 U.S.C. § 206(b); *see also* Pl.'s App. at 194 (Instruction 6, § B.1 ("In accordance with 42 [U.S.C. § ] 206(b), there shall be a CPO in the dental, nurse, pharmacy, and engineer categories.")).[10]

Of course, the Secretary was the initial holder of the authority to assign a commissioned officer to be the CPO under section 206(b), and could have decided to retain that authority, or even to reclaim it after it had been delegated. But the government does not argue that the Secretary is operating under reclaimed authority previously delegated. Other than the two delegation regulations cited above, the only authority bearing on this point discussed by the defendant was two instructions from the PHS Personnel Manual. The first, Instruction 6, clearly states that it "establishes the policy and procedure to nominate and appoint" a Chief Pharmacist Officer. Pl.'s App. at 193 (Instruction 6 § A). The instruction provides that a nomination "Board shall identify, evaluate and recommend candidates for CPO to the SG [Surgeon General], *who will make the final selection.*" *Id.* at 195 (Instruction 6 § E.1.b) (emphasis added). It further provides:

> If appointment of the CPO involves promotion of the nominee to a flag grade, regardless of whether the promotion is required by statute or is discretionary under 42 U.S.C. [§ ] 206(c)(1), the promotion will be accomplished as part of the CPO selection process and is not subject to the flag rank promotion process described in INSTRUCTION 7, Subchapter CC23.4,

"Flag Officer Selection and Assignment," of this manual.

*Id.* (Instruction 6 § E.1.c). The instruction later elaborates that the Nomination Board's "Executive Secretary will forward the Board's recommendations to the SG *for final decision,*" Pl.'s App. at 197 (Instruction 6 § E.4.d) (emphasis added), and concludes, "[a]ppointment as a CPO will be effected by an official personnel order (p.o.) which specifies the effective date and the projected ending date." *Id.* at 198 (Instruction 6 § F.2).

The other instruction discussed by the parties is Instruction 7, which the block quote above plainly makes inapplicable to the appointment of a CPO. As if this were not clear enough, Instruction 7 itself stresses that its "policies and procedures are *not* applicable to ... [s]election and assignment of ... those Chief Professional Officers that have been established at flag grades in accordance with INSTRUCTION 6 ...." Pl.'s App. at 200, CCPM CC23.4 Instruction 7 ("Instruction 7") §§ 2, 2.b. This instruction also contains the following dictum: "The authority to approve the promotion of officers to flag grade positions pursuant to 42 U.S.C. 206(b) and (c) has been retained by the Secretary." *Id.* at 201 (Instruction 7 § B.2).

Instruction 7 does not purport to give back the power to appoint section 206(b) officers to the Secretary (if indeed a subordinate could be understood to have the power to impose a task upon its superior, which appears unlikely). Nor does it identify an HHS regulation through which the approval authority "has been retained by the Secretary." Even if this dictum were to be considered an agency interpretation of the HHS regulation delegating authority to the Assistant Secretary for Health, *see* 53 FED. REG. 3457, the Court rejects this interpretation as "plainly erroneous" and "inconsistent with the regulation." *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (quoting *Bowles v. Semi-*

---

**10.** The acronym "CPO" as used in the Instruction refers to "Chief Professional Officers," which include the Chief Pharmacist Officer and the other three Service positions created by section 206(b).

*nole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945))).[11] The Secretary was quite explicit in retaining "the authority to approve the selection of persons to all" "special temporary positions in the grade of Assistant Surgeon General." 53 FED. REG. 3458; *see also* 53 FED. REG. 5047 (Assistant Secretary for Health states: "The Secretary has retained ... the authority to approve selection of persons in special temporary positions in the grade of Assistant Surgeon General."). As is discussed above, the CPO position was not a "special temporary position." Moreover, this instruction does not even apply to the appointment of a CPO, and thus any commentary concerning this process is beyond its scope.[12]

In summary, based on the plain text of section 206, the CPO position is not a "special temporary position," and under the applicable regulations delegating authority the Surgeon General, not the Secretary, possesses the legal authority to appoint individuals to this position.

### 2. Is this matter justiciable?

The government argues that this Court should follow the practice of other courts which have traditionally been loathe to interfere in military promotion matters. The judiciary is institutionally incapable of assessing the needs and demands of the military departments; hence the courts' reluctance to interject themselves into military decisions. As Mr. Justice Jackson famously admonished: "The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Accordingly, the defen-

dant contends that this Court should refrain from second-guessing the allegedly unfettered discretion of the Secretary or his delegate in selecting a CPO for the Service.

The plaintiff responds that the government's justiciability arguments are inapt and irrelevant because the Court is not called upon to review a discretionary decision, but rather a decision strictly governed by the statutes. Furthermore, Capt. Brooks argues that the rationale supporting the military promotion cases is inapplicable here—even though PHS officers enjoy many of the rights and privileges of members of the armed services—because the PHS is after all a sub-agency of HHS and not of the Army, Navy, Marines, Coast Guard or any other branch of government entrusted with national security. *Cf.* Pl.'s Reply at 2 (distinguishing *Dysart v. United States*, 369 F.3d 1303 (Fed.Cir.2004), and noting that the Defense Officer Personnel Management Act of 1980 does not apply to Commissioned Corps officers).

 The government offers substantial authority for the proposition that the courts must give deference to *the military* in its promotion practices. Defendant concludes that such cases apply with equal force to PHS promotions because the Commissioned Corps is a uniformed service. At least for the first proposition, the government stands upon unassailable ground. *See Adkins v. United States*, 68 F.3d 1317, 1324 (Fed.Cir. 1995) ("Courts will not interject themselves into the promotion process."); *Sargisson v. United States*, 913 F.2d 918, 922 (Fed.Cir. 1990) ("A court lacks the special expertise needed to review reserve officers' records and rank them on the basis of relative merit."); *Voge v. United States*, 844 F.2d 776, 782 (Fed.Cir.1988) ("[A]bsent a statute or regulation entitling a service member to a promotion as a matter of law, the Claims

---

**11.** Even if it were not plainly erroneous, as a *sub-agency's* (PHS's) interpretation of an agency regulation, it is not entitled to *Auer* substantial deference.

**12.** On the other hand, to the extent Instruction 6 may be read to govern the selection of chief professional officers to fill *special temporary positions*, this, too, appears to be plainly erroneous and inconsistent with the Secretary's retention of

the approval authority and the Assistant Secretary's retention of the power to create these positions. Further, the instruction's statement that "[g]eneral criteria by which CPOs may be promoted to flag rank grades is set forth in 42 U.S.C. [§ ] 206(c)", Pl.'s App. at 194 (Instruction 6 § B.3) is also plainly erroneous, as section 206(c) contains nothing of the sort.

Court has no authority to entertain [such a] claim."); *Mercer v. United States,* 52 Fed.Cl. 718, 721 (2002) ("Whether to promote a member of the armed services is a discretionary decision for the military leadership, which this Court cannot review."); *Neptune v. United States,* 38 Fed.Cl. 510, 516 (1997) ("The decision to promote an officer, as well as the method by which the decision is made, implicates highly discretionary questions of military judgment and expertise which civilian courts may not second-guess.").

But this deference is rooted in the assignment of control over the military to the President as Commander–in–Chief. *See* U.S. CONST. art. II, § 2, cl. 1; *Loving v. United States,* 517 U.S. 748, 773, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (President has authority over military discipline as well as conditions and limitations on punishment for violation of discipline); *id.* at 778–79, 116 S.Ct. 1737 (Thomas, J., concurring in judgment) ("heightened deference extends not only to congressional action but also to executive action by the President, who by virtue of his constitutional role as Commander in Chief ... possesses shared authority over military discipline"); *Department of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); *Rostker v. Goldberg,* 453 U.S. 57, 66 n. 5, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) ("That [the courts are] not competent or empowered to sit as a super-executive authority to review the decisions of the Executive and Legislative branches of government in regard to the necessity, method of selection, and composition of our defense forces is obvious and needs no further discussion.") (quoting *Simmons v. United States,* 406 F.2d 456, 459 (5th Cir.1969)); *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (for "military or diplomatic secrets," "these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities"); *Orloff,* 345 U.S. at 90–91, 73 S.Ct.

534.[13] The Court is not convinced that these precedents apply to the Commissioned Corps.[14]

The rationale supporting these courts' decisions in the military context would be equally applicable in the non-military context only if one were to focus on the common thread of executive discretion, rather than judicial unfamiliarity with military procedures, policy and decision-making. Indeed, if a court is presented with a mere matter of executive discretion, the judicial obligation is well-settled:

> The appointment to an official position in the Government, even if it be simply a clerical position, is not a mere ministerial act, but one involving the exercise of judgment. The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position. Therefore it is one of those acts over which the courts have no general supervising power.

*Keim v. United States,* 177 U.S. 290, 293, 35 Ct.Cl. 628, 20 S.Ct. 574, 44 L.Ed. 774 (1900), *quoted in Dysart v. United States,* 369 F.3d 1303, 1316 (Fed.Cir.2004). As the *Dysart* court noted, "[If the] appointment was not derailed as a result of action by a subordinate official acting in his own authority, but by the President, who decided not to make the appointment[, then s]uch action by the President or an officer acting for the President is simply unreviewable." 369 F.3d at 1316. By parity of reasoning the government argues that the appointment power of the Surgeon General (or of the Secretary), if discretionary, is not susceptible to judicial review. *See id.* at 1317.

But this truism misses the point of the plaintiff's contention. Captain Brooks asks this Court not to review whether the CPO Nomination Board made a poor decision in forwarding his and four others' names for final consideration, or whether the Surgeon General was too hasty in selecting Capt. Brooks for the CPO the day after the inter-

---

**13.** *See also* U.S. CONST. art. I, § 8, cl. 14 (giving Congress authority to "make Rules for the Government and Regulation of the land and naval Forces").

**14.** At least at times when the President has not made "the Service ... part of the military forces of the United States pursuant to Executive order," 42 U.S.C. § 213(a)(3).

view. Rather, the plaintiff argues that the Surgeon General exercised his discretion, and that either the Surgeon General or an underling unlawfully deprived Capt. Brooks of his *entitled* promotion. Executive discretion is thus not at issue—that is, if the plaintiff is correct that he was indeed *appointed* by the actions of the Surgeon General. This brings us to the consideration of Capt. Brooks's motion.

## B. The plaintiff's motion for summary judgment

The record,[15] Capt. Brooks contends, points ineluctably to the conclusion that the Surgeon General in fact appointed him to be CPO.

It is not enough for the plaintiff simply to establish that the Surgeon General had the authority to appoint a CPO without the approval of the Secretary, however; the Court must also determine whether all necessary steps were taken for the Surgeon General lawfully to exercise his appointment power. This inquiry must be based upon Instruction 6. Pl.'s App. at 193. As noted above, Instruction 6 forms part of the personnel manual, promulgated under the authority of the Surgeon General, that governs the Commissioned Corps members of the PHS. *See id.* at 238 (delegation to Surgeon General of powers necessary to administer Commissioned Corps Personnel System). Instruction 6 expressly predicates a Chief Professional Officer appointment on the issuance of "an official personnel order (p.o.) which specifies the effective date and the projected ending date." *Id.* at 198. Although Surgeon General Satcher in his September 18, 2000 memorandum ordered the DCP to issue the p.o., *see id.* at 102, it apparently was never issued.

---

15. At oral argument, plaintiff's counsel made several references to "an agency record" in this case. Tr. (Sept. 28, 2004) at 40, 43. The Court therefore asked directly whether an official agency record did in fact exist in this case. Plaintiff's counsel replied: "I don't know if the agency submitted one, but the agency record is the record up to and including the action of Mr. Blank, as Deputy Assistant Secretary, as the reviewing official." *Id.* at 44. Accordingly, references in this opinion to the "record" are to the official agency documents, associated with Capt.

## 1. The Ministerial Act Doctrine

An agency and its officers are bound to follow the agency's regulations. *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988); *see Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). The Surgeon General cannot on a whim dispense with the p.o. requirement. Captain Brooks, however, may nevertheless be entitled to the CPO position if the issuance of the p.o. is a ministerial act not subject to the discretion of the appointing officer. Viewed in this light, Capt. Brooks's complaint presents an issue with a long pedigree, dating back in U.S. courts at least to *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). At issue in that case was Mr. Marbury's right to his commission of appointment to office, which was signed but undelivered as the administration of President John Adams came to a close. That right depended upon whether the delivery of the commission was a ministerial act which the courts could command to be done, or whether the act was within the discretion of the appointing officer, in this case the President, and therefore not susceptible to judicial review. Mr. Chief Justice Marshall held for the Court that (1) the delivery of the commission was a ministerial act, *id.* at 166; (2) Mr. Marbury's right to his commission vested once President Adams had directed the Secretary of State (the same Mr. Marshall) to affix the seal and deliver the commission, *id.* at 162; and (3) the courts could in theory command the Secretary to deliver the commission, *id.* at 167–68.[16]

Chief Justice Marshall's "ministerial act" distinction has since become a keystone in mandamus and related jurisprudence. In *Kendall v. United States ex rel. Stokes,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), the relators sought a writ of mandamus ordering

---

Brooks's appeals to the BCCCR, that have been compiled in the parties' appendices submitted to the Court.

16. Of course, the holding for which the case is remembered is that Congress acted beyond its Constitutional authority in attempting to give the Supreme Court original jurisdiction over petitions for a writ of mandamus. *Marbury,* 5 U.S. (1 Cranch) at 173–80.

the postmaster general to make good on their mail-carrying contracts, in accordance with an act of Congress authorizing payment. The Court noted that the postmaster general's duty

> is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatsoever.... There is no room for the exercise of any discretion, official or otherwise; all that is shut out by the direct and positive command of the law, and the act required to be done is, in every just sense, a mere ministerial act.

*Id.* at 613–14. *See United States ex rel. Dunlap v. Black,* 128 U.S. 40, 44–46, 9 S.Ct. 12, 32 L.Ed. 354 (1888) (discussing mandamus); *United States ex rel. The International Contracting Co. v. Lamont,* 155 U.S. 303, 308, 15 S.Ct. 97, 39 L.Ed. 160 (1894) ("It is elementary law that mandamus will only lie to enforce a ministerial, as contra-distinguished from a duty which is merely discretionary.... Moreover, the obligation must be both peremptory, and plainly defined. The law must not only authorize the act but it must *require* the act to be done.") (citation omitted); *Kirwan v. Murphy,* 189 U.S. 35, 55, 23 S.Ct. 599, 47 L.Ed. 698 (1903) (ministerial duties are those "involving no exercise of judgment or discretion") (quoting *Litchfield v. The Register and Receiver,* 76 U.S. (9 Wall.) 575, 577, 19 L.Ed. 681 (1869)); *see also Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 2379, 159 L.Ed.2d 137 (2004); *National Treasury Employees Union v. Reagan,* 663 F.2d 239, 242 (D.C.Cir.1981) ("For more than one hundred and seventy-five years, the rule as to when an appointment takes place has been clear: 'when the last act to be done by the [appointing authority] was performed.' ") (quoting *Marbury,* 5 U.S. (1 Cranch) at 157).

Applying *Kendall* analogously to Capt. Brooks's case, the relators are Capt. Brooks, Congress is the Surgeon General, and the postmaster general is the DCP Director. Once the Surgeon General issued his memorandum, the last discretionary act necessary and precedent to the vesting of the CPO position in Capt. Brooks was complete; the

issuance of the p.o. was "in every just sense, a mere ministerial act." *Kendall,* 37 U.S. (12 Pet.) at 614. Because the DCP Director had no discretion to refrain from issuing the p.o. absent a subsequent order from the Surgeon General, his duty was ministerial. *Cf. Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 498, 18 L.Ed. 437 (1866) ("A ministerial duty ... is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law."). The DCP Director had no obligation to conduct a hearing or take proofs, but merely to follow the order. *Cf. The Secretary v. McGarrahan,* 76 U.S. (9 Wall.) 298, 312, 19 L.Ed. 579 (1869) (concluding that ministerial acts cannot involve "matters ... to be judicially heard and decided by the officer to whom the writ is required to be addressed"). The Supreme Court's mandamus cases, at least by analogy, support the conclusion that the last discretionary act in appointment of a CPO is the Surgeon General's command that a p.o. be issued.

### 2. The Ministerial Act Doctrine in the Federal Circuit and Court of Claims

Review of the precedents in our Circuit and its predecessor confirms that the issuance of a personnel order was a ministerial act. In *D'Arco v. United States,* 194 Ct.Cl. 811, 441 F.2d 1173 (1971), the Court of Claims was asked to decide whether the plaintiff's recess appointment to the temporary grade of major was valid even though not delivered. Before the commission's delivery the Marine Corps began an investigation of the plaintiff for larceny; the plaintiff was eventually subjected to court-martial and fined. Under Marine Corps regulations the plaintiff's commanding officer had the authority to refrain from delivering the commission if serious cause were present; he determined that the pending criminal investigation was serious cause. *See id.* at 1174. The plaintiff argued that his commission was valid without delivery and cited *Marbury* as support. The Court of Claims distinguished *Marbury* on the grounds that the plaintiff's commission was terminable at will, whereas Marbury's was good for five years. Therefore the Marine Corps Secretary "lawfully acted for the President when he withheld the

commission for the recess position, [and] validly refus[ed] under the rationale of *Marbury v. Madison* to make the appointment." *Id.* at 1175 (citation omitted).

Although it is true that the CPO may be terminated at the will of the Surgeon General, *see* Pl.'s App. at 198, Capt. Brooks's case differs from *D'Arco* because in the latter the Marine Corps Secretary and the commanding officer were authorized by regulation to delay an appointment if serious cause were present. The DCP Director does not possess similar authority, in the context of a CPO appointment, to refuse to issue a personnel order.

*Goutos v. United States,* 212 Ct.Cl. 95, 552 F.2d 922 (1976), involved a civilian Army employee who sought back pay for an appointment that the government argued was never completed because a Form 52 had not been issued. The plaintiff's supervisor had repeatedly but unsuccessfully sought to have the Civilian Personnel Officer sign the Form 52. The plaintiff argued that either the form was unnecessary for the appointment or tacit appointment could be inferred from the personnel officer's inaction. The Court, citing *Marbury,* held:

> [I]t has long been the law that an appointment is not made until the last act required by the person or body vested with the appointment power is performed. Here the final act required was the signature of the [Civilian Personnel Officer] on the form. [He] never signed, so plaintiff was never appointed.

*Id.* at 924–25 (citations omitted). But in the case of Capt. Brooks, the Surgeon General did sign the memorandum (the Form 52

equivalent) selecting the plaintiff as the CPO. Although the DCP Director did not issue the p.o., he was not the official vested with the appointment power; therefore his failure to act, according to *Goutos,* cannot affect the appointment's legality.

The Federal Circuit addressed the same issue in *Horner v. Acosta,* 803 F.2d 687 (Fed.Cir.1986). The Navy had hired the plaintiffs for special intelligence operations; due to security concerns, the Navy established a parallel civil service system just for employees of the special unit. The plaintiffs argued that they were entitled to standard civil service privileges even though they were hired as "independent contractors," and cited *Marbury* for the proposition that signature or writing requirements were mere "window dressing." The government countered that a writing signed by an official with authority was a condition precedent to a government appointment. The appeals court agreed, distinguishing *Marbury* by noting that all the formal requirements for appointment were there met, whereas the plaintiffs in *Horner* had no written document formally appointing them as civil servants. *See id.* at 693.

Here Capt. Brooks argues that his right to the CPO position vested once the Surgeon General sent his memorandum ordering the DCP Director to issue a p.o. denominating Capt. Brooks as the next CPO. Once that memorandum was sent, the Surgeon General had performed the last discretionary act necessary to the vesting of the appointment in the plaintiff. The DCP Director's failure to issue a p.o. is not fatal to the plaintiff's claim; it is simply a ministerial act having no effect on the plaintiff's right to his position.[17]

---

17. Capt. Brooks's case also resembles *O'Shea v. United States,* 28 Ct.Cl. 392, 1800 WL 1950 (1893). The Secretary of War, William Endicott, had sent the Reverend Maurice O'Shea a commission appointing him as the Army Chaplain of Fort Niagara. The recess appointment had been signed by the Secretary with the authority of President Cleveland. Shortly after O'Shea's acceptance, Adjutant General R.C. Drum, at the Secretary's behest, wrote to O'Shea asking him to return the Secretary's letter, which was "transmitted to you by me prematurely." *Id.* at 394. O'Shea dutifully returned the letter but continued under the belief that he was the post chaplain. One month later Drum again wrote to O'Shea suggesting that he not incur any expenses as post chaplain "as there is now some uncertainty as to your appointment to that office." *Id.* at 395. O'Shea replied that he had already traveled to Fort Niagara because its commander had informed him that an officer awaiting orders was required to report to his post once a month. *Id.* When the Senate returned from recess it confirmed the Reverend John Dolphin's appointment to the post chaplaincy of Fort Niagara. *Id.* at 394. O'Shea accordingly brought suit against the United States for the chaplain's pay from the date of the alleged recess appointment to the Senate's confirmation of Dolphin. The court rejected the government's argument that O'Shea had never been appointed, concluding that no

In this regard, it should be noted that the Surgeon General had not asserted that he signed the memorandum by mistake, perhaps because a draft was placed in the wrong pile of papers while he was awaiting the Secretary's approval. Such a claim might have little credibility, given the explicit language of the memorandum. *See* Pl.'s App. at 102; Def.'s. App. at 5 ("I have selected CAPT Anthony J. Brooks ... please issue the appropriate personnel order ...."); *see also* Pl.'s App. at 188; Def.'s App. at 17 (BCCCR finding it was "not persuaded that Dr. Satcher was not aware of the details of the selection process" in which he was to make the "final decision" and "the promotion involved"). Instead, the DCP said the sole "error" concerning the memorandum was that "the Surgeon General (SG) lacks the authority to appoint the Chief Pharmacist." Pl.'s App. at 170. It also admitted that the Surgeon General "never sought nor obtained the concurrence of the Secretary," *id.*, and when asked by the BCCCR whether the Surgeon General intended for Capt. Brooks to be promoted to grade 0–7, was tellingly silent. *Compare* Pl.'s App. at 168 *with id.* at 170–71. Thus, the only conclusion one can reach is that when the Surgeon General signed a memorandum to the DCP informing it that he selected Capt. Brooks to be CPO and ordering the issuance of a p.o., he meant it. By that act, Capt. Brooks was appointed to the position, effective October 1, 2000.

*3. Did the Surgeon General Revoke the Appointment or Effectively Remove Plaintiff from the CPO Position?*

■ Simply because Capt. Brooks's appointment was effective does not mean that he is entitled presently either to the position[18] or even to money, however. Instruction 6 of the personnel manual provides that the CPO serves for a term not to exceed four years. Pl.'s App. at 198 (Instruction 6 § F.1). But it also subjects the CPO to removal "at any time as the SG may direct." *Id.* (Instruction 6 § F.4). Therefore, any entitlement to the position or to back pay based on a CPO grade of 0–7 would terminate upon the Surgeon General's exercise of his removal power. *See, e.g., Marbury,* 5 U.S. (1 Cranch) at 162 ("Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable...."); *D'Arco,* 441 F.2d at 1175; *see also Keim,* 177 U.S. at 293, 20 S.Ct. 574 ("In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment."). There appears to be no limit on the Surgeon General's exercise of this discretion, except from external sources such as anti-discrimination laws or Constitutional provisions.[19]

The Court stresses that, just as the appointment power was delegated to the Surgeon General, so, too, was the power of removal. Although it could have adopted regulations delegating the removal power— as it could, on the other hand, have adopted regulations circumscribing this power—the defendant does not appear to have done so. The person, then, who had the power to "direct" removal was the Surgeon General himself, not one of his underlings, well-meaning though they might be.

■ But the exercise of this removal power by the Surgeon General cannot be determined based on the record before the Court. Four days after the Surgeon General signed the memorandum appointing Capt. Brooks and ordering the p.o. to be issued, Dr. Wyatt—the Acting Chief of Staff of the Surgeon General's office—called Capt. Brooks

---

provision of law required that this commission bear the president's signature. *Id.* at 400–01. The government's argument that the recess appointment had been revoked was also rejected by the court, which held that O'Shea had done nothing during his chaplaincy that would justify dismissal or court martial. *Id.* at 401–02. As no evidence was presented showing that Secretary Endicott sent the commission without President Cleveland's approval, the court awarded the back pay. *Id.* at 403–04.

18. In fact, the plaintiff no longer seeks the position itself but only the back pay. *See* Am. Compl. at 6–7; Pl.'s Resp. to Mot. to Dismiss and Cross–Mot. for Summ. J. at 10. The position's term would have expired on September 30, 2004.

19. Presumably, an allegedly arbitrary action might be the subject of a district court suit under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, in the absence of other remedies.

and apparently told him that the memorandum was "sent in error." Pl.'s App. at 103; Def.'s App. at 6. The note memorializing this call, signed by Dr. Wyatt three days later, states that he called plaintiff not at the behest of the Surgeon General, but "[a]t the instruction of" the Deputy Surgeon General.[20] *Id.* Instead of issuing a personnel order, the DCP Director issued a letter of reprimand on September 28, 2000, three days before the appointment was to be effective. Pl.'s App. at 104. The day before, the DCP Director called Capt. Brooks to inform him of the LOR, telling him this would cost him his "star" and his promotion. Pl.'s App. at 176; *id.* at 187. Captain Brooks recounted a telephone conversation with the Deputy Surgeon General two weeks later, in which he was allegedly told he could not be promoted with an LOR in his file. *Id.* at 176. The LOR was rescinded on January 9, 2001. *Id.* at 138. Three weeks later, Capt. Brooks called the Deputy Surgeon General to inform him the LOR was rescinded, and the plaintiff was allegedly told that he had to re-compete for the CPO position. *Id.* at 177. But it was not until the following month, in response to plaintiff's addition of the LOR grievance to his BCCCR application, that the defendant first suggested that approval by the Secretary was needed for Capt. Brooks's appointment. *Id.* at 151. Noticeably absent from these events is any mention of the Surgeon General himself.

Indeed, as the BCCCR concluded:

> There was no record of an accountable paper trail to CAPT Brooks explaining the reason why he would not be appointed nor did the record explain why an effort was not made to obtain the concurrence of the Secretary since this was a high level position rather than withdraw or cancel the selection.

Pl.'s App. at 187; Def.'s App. at 16. The BCCCR had asked the DCP Director to determine the answers to several questions, including: "If [Capt. Brooks] did not serve in the [CPO] billet, please advise why he did not do so;" whether the Surgeon General "intend[ed] for [Capt. Brooks] to be promoted;" and what was "the influence of the Letter of Reprimand on CAPT Brooks' promotion prospects and on the promotion activities." Pl.'s App. at 168. The response for the most part sidestepped these questions, contending (incorrectly, as is discussed above) that the approval of the Secretary was needed, conceding that the Surgeon General never sought this, and stating without explanation that the Surgeon General "decided to reconvene the selection board for Chief Pharmacist after issuing a Manual Circular which expanded the pool of qualified candidates." *Id.* at 170. This Manual Circular, by the way, issued on November 6, 2000, states that section 206(b) "provides that the Surgeon General shall assign commissioned officers from the Regular Corps" to be, among other things, the CPO, and makes no mention of the need for the Secretary's approval. *See id.* at 172.

There is thus no evidence in the record supporting the Surgeon General's affirmative act of revoking his appointment of Capt. Brooks to be the CPO. This is most likely because the SG believed that the Letter of Reprimand prevented Capt. Brooks's promotion, as plaintiff claims the Deputy SG and Director of DCP told him.[21] Perhaps it is because the SG thought, incorrectly, that he lacked the power to appoint and thus did not realize he had to reverse the effect of his memorandum. But no matter the reason, an outright revocation does not appear to have been directed by the Surgeon General.

One might plausibly argue that any entitlement to the CPO position ended as a matter

---

20. Contrary to the government's contention that this record shows the appointment "had been rescinded because the Surgeon General lacked the authority to appoint someone to a flag grade level without approval of the Secretary," Def.'s Mot. to Dismiss at 4, Dr. Wyatt's record of the call merely states that "the memorandum had been sent in error" and that he "indicated a problem in processing the action." Def.'s App. at 6; Pl.'s App. at 103.

21. The LOR was based on Capt. Brooks's "unauthorized disclosure" of documents, allegedly in violation of the Privacy Act, and not on his use of access to personnel files for his own purposes, or other acts that would reflect poorly on him regardless of whether a law were violated. *See* Pl.'s App. at 104; Def.'s App. at 19.

of law upon his selection of Capt. Walling as the new CPO. *Cf. O'Shea v. United States*, 28 Ct.Cl. 392, 399, 1800 WL 1950 (1893) (back pay sought from time of appointment through date of successor's commission). But considering our Court's convention of basing review of this type of claim upon an administrative record compiled before and by the Correction Board, *see, e.g., Bishop v. United States*, 26 Cl.Ct. 281, 285 (1992), prudence dictates that the Court demur on this specific issue and permit the BCCCR to analyze the question first.[22] Although the Board correctly concluded that the Surgeon General had the power to appoint a CPO, it failed to appreciate the legal consequences of the SG's September 18, 2000 letter. Instead of recognizing that the issuance of a personnel order in Capt. Brooks's name was a ministerial act that necessarily had to be done, it thought that the LOR merely "stopped the selection process and issuance of the Personnel Order which *may have identified* CAPT Brooks as the Chief Pharmacist and his promotion to the flag grade 0–7." Pl.'s App. at 188 (emphasis added); Def.'s App. at 17.

Not realizing that the plaintiff had been appointed, the BCCCR never looked at when his appointment might have been revoked. But it would be particularly helpful to the Court, as well as the parties, were the BCCCR to make such an inquiry. After all, it may turn out that the since-rescinded LOR was the reason that Secretary approval was not sought for Capt. Brooks's appointment; that the Manual Circular was issued; and that a new selection board was convened. In the light of this conclusion, the BCCCR might well decide that "to correct an error or remove an injustice," 10 U.S.C. § 1552(a)(1), requires that the record show that Capt. Brooks served the full four-year term as CPO. Under these circumstances, it is best to let the facts for the record be developed before the Board.

*4. The Secretary's legal error*

■ Capt. Brooks's complaint is, in essence, an appeal from the Secretary's decision not to award him promotion to an O–7 grade effective October 1, 2000. When the plaintiff brought before the BCCCR his request for a correction of his records to that effect, the Board determined that the letter of reprimand "resulted in an error and an injustice." Pl.'s App. at 188. To "correct the effect of the error and injustice," the Board recommended that Capt. Brooks be given priority consideration for three years for O–7 positions bearing the "complexity, responsibility and importance" appropriate to his qualifications and experience. *Id.* The Board forwarded its recommendation to Deputy Assistant Secretary Blank, who is the Secretary's delegate pursuant to regulations. *See* CCPM CC29.9 Instruction 5 § B (PHS 16–00–70(E)); Pl.'s App. at 222. The Deputy Assistant Secretary, on behalf of the Secretary, disapproved the recommendation. Pl.'s App. at 191. This is the action appealed to our Court. *See Richey v. United States*, 322 F.3d 1317, 1323 (Fed.Cir.2003).

The Court of Claims in *Boyd v. United States*, 207 Ct.Cl. 1, 1975 WL 22807 (1975), articulated the standard of review to be applied when reviewing the disapproval of a Board recommendation:

> The court ... may reject the decision of a Secretary only if he has exercised his discretion arbitrarily, capriciously, in bad faith, contrary to substantial evidence, or where he has gone outside the board record, or fails to explain his actions, or violates applicable law or regulations. Then we will not hesitate to set him right.

---

22. This convention of restricting review to the administrative record seems to conflict with the express holding of the Federal Circuit that plaintiffs challenging Correction Board determinations are "entitled" to supplement this record with additional evidence. *See Heisig v. United States*, 719 F.2d 1153, 1157 (Fed.Cir.1983) ("Appellant was entitled to offer de novo evidence in his presentations ... to the district court."); *id.* at 1156 (holding that the same precedents should apply to our Court and district courts in this area). This practice also rests, in part, on Su-

preme Court jurisprudence concerning the APA. *See, e.g., Bishop*, 26 Cl.Ct. at 285; *Long v. United States*, 12 Cl.Ct. 174, 177 (1987). This jurisprudence, in turn, appears to rest on a misreading of the legislative history of the APA. *Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 350 n. 25 (2004). Further, the substantial evidence standard in *military* benefits cases is primarily derived from the deference courts afford to military judgment in military matters, *see Heisig*, 719 F.2d at 1156, and may not be applicable in this case, for the reasons discussed in the text, above.

*Id.* at 8–9, 1975 WL 22807. *See Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir. 1998); *Hertzog v. United States,* 167 Ct.Cl. 377, 384–85, 1964 WL 8548 (1964). Here, the Deputy Assistant Secretary justified his disapproval of the Board's recommendation on the theory that:

> The [CPO] position was a Flag Grade and required the Secretary's approval making the selection process for the Chief Pharmacist position different from the selection process utilized for other positions. In addition there was no guarantee that even if the Surgeon General had sought the Secretary's approval, the Secretary would have concurred with the selection and the appointment of CAPT Brooks.

Pl.'s App. at 191. The BCCCR, without addressing either the statutory or delegation issues, took the opposite view, based upon its analysis of Instructions 6 and 7, that Secretarial approval was not required for the appointment of the CPO. *Id.* at 186, 188. As the Court has already determined, the CPO appointment does not require Secretarial approval. The Deputy Assistant Secretary's legal conclusion was in error. Under the *Boyd* test, the Court must reject his decision.

According to PHS regulations, the Deputy Assistant Secretary as the Approving Authority had three options when presented with the Board's recommendation. He could have (1) disapproved the recommendation without further action; (2) approved the recommendation; or (3) remanded the matter to the Board for its further consideration. *See* CCPM CC29.9 Instruction 5 § B (PHS 16–00–70(E)); Pl.'s App. at 222. His exercise of option one was improper, as it was based on a wrong interpretation of the applicable statutes and regulations. But merely because the Board correctly determined the repository of the appointment power does not mean that its recommendation should have been approved—and since the recommendation was to give Capt. Brooks preferential treatment in future job applications, it should not have been approved.

The Board is authorized to correct *records.* 10 U.S.C. § 1552(a); 42 U.S.C. § 213a(a)(12). Its power to craft a fit remedy is substantial. *See, e.g., Denton v. United States,* 204 Ct.Cl.

188, 201, 1974 WL 21682 (1974) (backdating discharge); *Yee v. United States,* 206 Ct.Cl. 388, 512 F.2d 1383, 1388–89 (1975) (reinstatement and award of back pay); *Roth v. United States,* 378 F.3d 1371, 1382 (Fed.Cir.2004) (elimination of pass-overs); *Doyle v. United States,* 220 Ct.Cl. 285, 599 F.2d 984, 1004 (1979) (notices in officers' files explaining gaps or other possible sources of prejudice). But its power does not justify the remedy it recommended. For the Board did not recommend that anything in Capt. Brooks's personnel file be corrected: no backdated promotion, no award of overdue pay, no increase in benefits. In short, not one entry in Capt. Brooks's records was to be changed. Instead, he was offered equitable relief, standing alone. This the Board cannot do. *Cf. Haselrig v. United States,* 333 F.3d 1354, 1355 (Fed.Cir.2003) (discussing special selection board review *following* correction of serviceman's record); *Hoskins v. United States,* 61 Fed.Cl. 209, 211–12 (2004) (same); *Reeves v. United States,* 49 Fed.Cl. 560, 562 (2001) (same); *Sanders v. United States,* 219 Ct.Cl. 285, 303–04, 594 F.2d 804 (1979) (same).

As is noted above, the reason that the BCCCR did not correct Capt. Brooks's record in this regard was the wrong legal conclusion that a personnel order "may have identified" plaintiff as the CPO, Pl.'s App. at 188; Def.'s App. at 17, when the p.o. that the Surgeon General had ordered *would have* so identified him. The Deputy Assistant Secretary, in turn, would have acted contrary to law had he approved the Board's recommendation. Hence, choice two above was not available. Accordingly, the Deputy Assistant Secretary should have remanded the matter to the Board for additional consideration.

## C. Remand

The Court's power to remand matters to Corrections Boards derives from the Tucker Act. *See* 28 U.S.C. § 1491(a)(1) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."). *See, e.g., Istivan v. United States,* 231 Ct.Cl. 671, 689 F.2d 1034, 1039 (1982); *Emil W. Kaeserman,* 207 Ct.Cl. 983,

985, 1975 WL 6631 (1975); *George W. Haber,* 200 Ct.Cl. 749, 750, 1973 WL 5025 (1973).

Under RCFC 56.2 we may remand to the Secretary or his delegate, here the Deputy Assistant Secretary for Program Support. *See, e.g., Metz v. United States,* 61 Fed.Cl. 154, 174–75 (2004); *Christensen v. United States,* 60 Fed.Cl. 19, 28–30 (2004); *Black v. United States,* 24 Cl.Ct. 465, 470–71 (1991); *Yount v. United States,* 23 Cl.Ct. 372, 383 (1991); *Gifford v. United States,* 23 Cl.Ct. 8, 24 (1991); *Cohn v. United States,* 15 Cl.Ct. 778, 796 (1988). On remand, this Approving Authority should in turn remand the matter to the BCCCR, in order that additional information may be obtained as to the date the Surgeon General effectively revoked the appointment of Capt. Brooks and whether the Letter of Remand was the reason Secretary approval for Capt. Brooks's promotion was never sought; the reason the Manual Circular of November 6, 2000 was issued; and the reason the new selection board convened. The Board shall also address whether the presence of the Surgeon General's September 18, 2000 memorandum in Capt. Brooks's file, at the time of the re-competition for the CPO position, was materially prejudicial to his chances for selection as the CPO and therefore an error or injustice.

## IV. CONCLUSION

For the foregoing reasons, the Court **DE-NIES** the defendant's motion to dismiss, and **GRANTS–IN–PART** the plaintiff's cross-motion for summary judgment, finding that Capt. Brooks was appointed to the CPO position by the Surgeon General but that the record does not indicate when this appointment terminated. The matter is, pursuant to RCFC 56.2(a), **REMANDED** for six months to the HHS Secretary's delegate, the Deputy Assistant Secretary for Program Support, for action consistent with this opinion and pursuant to CCPM CC29.9 Instruction 5 § B (PHS 16–00–70(E)). Under RCFC 56.2(a)(2)(C), the Court **STAYS** consideration of the remainder of the plaintiff's motion for six months from the date this order is filed, pending further action by the Deputy Assistant Secretary and the BCCCR, and the

parties shall file joint status reports as required by RCFC 56.2(a)(5).

**IT IS SO ORDERED.**